850 A.2d 566 (2004)
370 N.J. Super. 73
AVALON MANOR IMPROVEMENT ASSOCIATION, INC., Avalon Manor Annexation Committee and Thomas W. McFarland, Jr., Plaintiffs-Appellants,
v.
TOWNSHIP OF MIDDLE and Middle Township Committee, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued April 28, 2004.
Decided June 21, 2004.
*568 Robert S. Sandman, Atlantic City, argued the cause of appellants (Hankin, Sandman, Bradley & Palladino, attorneys; Mr. Sandman and Jenna M. Cook, on the brief).
Robert L. Taylor, Stone Harbor, argued the cause for respondent Township of Middle.
Respondent, Middle Township Committee, did not file a brief.
Before Judges KING, BRAITHWAITE and LISA.
*567 The opinion of the court was delivered by
LISA, J.A.D.
Plaintiffs, a property owner, a homeowners association and a committee of that association, from the Avalon Manor section of Middle Township, sought on behalf of the residents of their island community deannexation from Middle Township, and annexation to the Borough of Avalon (Avalon). They petitioned Middle Township for deannexation. The Middle Township Planning Board conducted hearings on the application and concluded deannexation would have various substantial detrimental impacts on the Township. The Township Committee then passed a resolution denying plaintiffs' petition.
Plaintiffs filed a complaint in lieu of prerogative writs challenging that determination. In a thorough and well-reasoned written opinion, Judge Perskie dismissed plaintiffs' complaint, finding the Township's denial was not arbitrary or unreasonable. Plaintiffs now appeal. They contend the judge erred in determining the Township acted reasonably and in refusing to limit the financial impact evidence to assessed values for the year immediately preceding the deannexation petition. We reject these contentions and affirm.

I
Middle Township (Township) in Cape May County is approximately seventy-two square miles large. In its northeast corner lies Avalon Manor (Manor) consisting of about 150 homes in a two-square-mile area, one of several hamlets or villages *569 within the Township. Manor is a bay island, lying between the mainland and a barrier island on which Avalon is located. Manor has been a part of the Township since the Township's 1798 incorporation. It makes up about 2.7% of the Township. Manor has been the historical access point to Avalon from "the inland," but Avalon is also accessible from Stone Harbor and Sea Isle City.
On May 5, 2000, plaintiffs filed a petition with the Township seeking a resolution consenting to Manor's deannexation, and informing the governing body of plaintiffs' plans to seek annexation of Manor to Avalon. The land plaintiffs sought to be deannexed was made up primarily of residential lots and one marina, and the balance consisted mainly of coastal wetlands. Contiguous to the land sought to be deannexed was a NJDEP-approved dredge disposal site being used by Avalon.
The petition was authorized by the statutorily required sixty percent of Manor's legal voters. Among the reasons asserted for deannexation were that manor was "wholly isolated from any other portion of upland contained within the Township," and that Manor had a number of similar attributes to Avalon and significant concerns which Avalon shared but in which the remainder of the Township had no interest. And deannexation, according to the petition, would not result in any economic hardship to the Township. If successful in gaining the Township's consent to deannexation, plaintiffs would submit a second petition to Avalon for annexation. The Township Committee passed a resolution transferring the deannexation petition to the Planning Board (Board) to conduct hearings on the petition and make a recommendation. The Board held hearings between June 2000 and May 2001.
Ian Jerome, plaintiff's planner, described Manor as "isolated" and "low lying," being "entirely inundated periodically," and as experiencing "many of the environmental problems of flooding that is [sic] associated with the barrier, with the bay island communities." There were no municipal recreational facilities in Manor, and the only recreational facility of any kind was the county fishing pier. All of the "community facilities," were located outside Manor such as schools, the municipal building and a hospital. The geographic distance to these various facilities was one of the reasons "that Avalon Manor tends, physically and as a community, to associate itself along with Avalon than [sic] it does with the balance of Middle Township." According to Jerome, "the history of Avalon Manor has been right in and around the primary points of access and connection between the mainland and the Borough of Avalon," with the road bridge at 21st Street, connecting Avalon with the mainland, dating from 1914.
Jerome believed Manor was "a distinct, social community." Interaction was "primarily with Avalon, much more so than it is with Middle Township." According to a survey conducted by Jerome, with the exception of doctors and clinics, which showed a "50/50" split, Manor residents indicated "a much higher degree of interaction with Avalon than with Middle Township," in "a wide range of activities," including social and civic clubs, sports facilities, video stores, health clubs and the recycling center.
Manor residents had a much higher percentage (38%) of year-round seniors (age sixty-five or older) than either the state or county averages, and roughly twice the percentage as the Township. Avalon's percentage of seniors, at twenty-nine percent, was much closer to Manor's. There were no Manor children in Township public schools. The two school-aged children *570 who lived in Manor attended private schools.
According to Jerome, "seasonality factors" aligned Manor more closely with Avalon than the Township. In summer the Township's population went from about 14,771 to 55,100, but Avalon's population soared from 1,800 to 31,000 and approximately seventy percent of Manor's population was seasonal. Seventy-two percent of Manor properties had boat slips and direct access to the water, which Jerome saw as further indicating Manor had specific needs and concerns different from the Township.
Because of the proximity of Avalon's emergency services compared to those of the Township, Jerome felt that Manor would "be a safer community for its primarily elderly population if it was part of Avalon." Moreover, the Township had no flood plain management plan, while Avalon had one. The cable service the Township used to notify residents of an area emergency did not service Manor, whereas Manor and Avalon used the same cable service.
Avalon, unlike the Township, had an ongoing marina dredging program, and Jerome felt that Manor would benefit from such a program given "the deterioration in marina access to Avalon Manor properties due to siltation." Given the high number of Manor residents who had slips and the fact that a majority rated fishing and boating "as a very high priority," Jerome concluded that a dredging program was key to maintaining the value of those properties. Avalon, meanwhile, had both the required DEP and Army Corps of Engineers permits for its dredging program, and obtaining such permits was "difficult." Thus, even if the Township wanted to engage such a program it would be extremely expensive and time consuming and, given the logistics of the Township and other concerns, might not even be feasible. Other examples of municipal services which Avalon offered more frequently or to a greater degree than the Township included summer trash pickup, street sweeping and grass mowing.
Jerome also concluded deannexation would create no negative impact on the Township. The only physical Township "improvement" in Manor was the roadway itself, and there had been no recent municipal expenditures on that. According to the Township's master plan there was no future capital improvement planned for Manor. Moreover, if the Township made an effort to address the specific needs of Manor (such as flood mitigation issues, general concerns of an elderly population, and dredging programs), the cost would be substantial. Thus, if deannexation were permitted the Township would actually save money from not having to address those issues. Fire, police and rescue operations would also experience savings because the Township would "not have to extend its service area [to Manor] ... and the distances involved." There would be no impact on water or sewer concerns, because Manor water was served by a separate water district, and the sewer was "a regional issue."
Jerome opined that annexation of Manor to Avalon would not remove from the Township "a significant portion of the developable lands" of the municipality. At any rate Manor was already almost fully developed, given the topography and features of lands making up most of the underdeveloped portions of Manor, a figure Jerome approximated at ten percent.
John Petersen was plaintiffs' expert in municipal finance and fiscal impact. He concluded that Manor did not represent a significant part of the Township's tax base, grounded in part on the facts that Manor "is pretty well built out" and could not be *571 significantly more developed, and that the Township "itself is at a point where it appears that there's economic vitality and development that's occurring." If Manor were to be deannexed, it would have no impact on the Township's credit rating.
Petersen's analysis was based on information from both the 1999 and 2000 tax years. In terms of 1999 values, the portion of real estate represented by Manor's proposed deannexation amounted to $22.5 million in assessed values, or about 2.5% or 2.6% of the Township's "overall tax base." Petersen did not consider that to be significant given the "dynamic situation" of real estate values. Assessed values always changed over time, and "[i]n any given year there can be fluctuations," but a loss of about 2.5% would not cause the Township "financial turbulence" because it "is a pretty good size jurisdiction and a lot of things are happening.... I won't say it's a fly speck, but its not terribly material." In terms of the 2000-year assessed values, Petersen put the loss to the municipality at about 3.5 percent.
In Petersen's opinion when a municipality faced a loss in tax base of the extent contemplated here it would likely not raise taxes in response, but address the loss in some other, less drastic fashion. One option would be to "run down your fund balance and pray for rain." But the more likely scenario, especially inasmuch as the tax-base loss carried with it a certain amount of savings from the concomitant drop in needed services, was to cut expenditures. Another possibility was to begin getting tax money from particular properties currently exempt, and Jerome identified two such potential sites in the Township which were each assessed for about $1.6 million and were or would be up for sale.
Between 1996 and 1999 Township assessments increased each year (1996: $13.5 million; 1997: $12 million; 1998: $16 million; 1999: approximately $20 million). Petersen listed those types of increases as a means to offset any loss created by deannexation. Petersen identified properties upon which the Township could foreclose which were assessed at approximately $4.5 million. Foreclosure and resale of such properties would place them back in a tax-paying posture. And the Township could apply tougher enforcement tactics to enhance its tax collection rate.
Overall, Petersen acknowledged that deannexation could cause the Township to have to lay off some employees, but that other means were available to offset the loss in tax income, such as using people "on a part-time basis or maybe you don't fill a position" right away. Nevertheless, he did observe that the municipal school would likely suffer the largest budget impact though he did not foresee laying off teachers, and commented that school funding could be found from other sources. Concluding that "adjustments ... will have to be made," he summed up his appraisal of the ongoing effect of deannexation:
Reduction in costs, some efficiencies will obviously help make up some of the loss. And, again, I can't look at a two percent, two and a half percent, three percent erosion in that particular tax base, on a historical basis, and say that that's traumatic. That's going to be replaced by growth elsewhere. It's not like the Township's tax base is shrinking. It's in the context of growth.
Joseph Ravitz, the municipal assessor, clarified that the assessments for the municipal properties that Petersen indicated were saleable were outdated. Ravitz said for the prior three years the property values in Manor had "been increasing in a very rapid manner." A typical 50-by-100-foot lot on Seabreeze Lane, for example, *572 that sold for $125,000 in 1998 or 1999, sold for $215,000 in 2000. Among the reasons Ravitz cited for the increases were the paving of roads and installation of the sewer system.
Houses under construction in the neighborhood were listed for sale "for over $500,000." Many older homes were being "rehabed or rebuilt," thereby increasing in square footage. He thus disagreed with plaintiffs' contention that because there were few vacant lots left in Manor "the growth is ... going to plateau or stop." He also cited the trend in similar communities where older, out-of-date houses were being torn down and replaced with newer, larger ones. He thus believed that the ratable base in Manor would "grow by millions of dollars ... for the next five years." Total Manor taxables for 1999 were $24,569,200, and $32,029,700 for 2000.
Dr. Robert Elder, the Township school superintendent and a non-voting member of the School Board, confirmed that the Township did not "get a lot of students" from Manor. He understood that Manor's deannexation would result in a loss to the school district of approximately $459,000. Elder described the potential cuts in services to the school system if the district lost that amount of tax revenue on a continuing basis. In order to raise that amount of money Elder would have to ask for a five-cent increase in the school tax, an "extraordinary happening, something that we wouldn't want to do very often."
James Alexis was the Township business administrator. According to him Manor received the same level of municipal services as all other areas in the municipality. In his experience the Township received no more complaints from Manor residents about Township services than it did from the other parts of the Township. From time to time the governing body actually met in the Avalon Manor Improvement Association building. In 1989, when the Legislature abolished all small sewer districts within municipalities, the Township reacted quickly to take over Manor's sewer system. He knew of no public safety issues in Manor that had gone unaddressed. The Township had full-time paid rescue services which served Manor as well as the rest of the municipality.
Alexis also expressed that the waterways and wetlands making up a portion of Manor were major assets promoting tourism to the area, as well as serving to enhance living in the Township generally. Avalon's utilizing the dredge soil site which was actually within the Township was in violation of the Township's own 1984 dredge soil ordinance. Since the hearings had begun in this matter, the Township was investigating and developing a municipal flood plan.
Glen Ortman, a CPA and RMA, performed an analysis of the financial consequences to the Township of deannexation. For 2000, the ratables loss would be $32,029,700 out of a total net valuation taxable of $901,835,239, or 3.56 percent. If deannexation occurred, he computed a 5.1-cent increase in the school tax for the 2000 year, or from $1,381 to $1,432, for example, on a $100,000-assessed property. County taxes would remain "about the same," but local municipal taxes would also rise, and Ortman put the amount at another two cents. Fire district taxes could also rise about half a cent, meaning the overall increase would be 7.5 cents. Ortman made clear that whatever the revenue loss from deannexation (which he calculated at $640,000), that amount was not merely a one-time loss but would continue in subsequent years.
As of 2000 the tax rate in Avalon for school taxes was about 9.7 cents per $100 of assessed valuation, and if deannexation occurred and Manor became part of Avalon, *573 Ortman calculated a decrease in the Avalon school tax rate to about 9.4 cents per $100 of assessed value. Because the county tax rate was higher in Avalon than in the Township, however, Manor residents would actually pay more in county taxes if deannexation occurred ($50 per year more on a $100,000 property). Nevertheless, when he factored all the tax increases and decreases Ortman concluded that based on year 2000 information, a $100,000 Manor property would be assessed $2465 in taxes as a Township property, and $976 as an Avalon property, for a decrease of $1,489. Ortman's report contained many other calculations demonstrating the tax benefits to Manor residents that would flow from deannexation.
Defendant's planner, James Miller, did not classify Manor as "unique, given the development patterns of the community." Rather, he saw the entire Township as a collection of "hamlets and villages and settlements" of which Manor was a valuable but not atypical part. Moreover, while "there's some proximity geographically to Avalonactually, from a driving standpoint, you have to go all the way out and cross the bridge andyou know, so its relatively separate from Avalon," it was "also relatively separate from the balance of the Township." Stone Harbor Manor, Miller said, which was also part of the Township, was "very similar" in its location, makeup and character to Manor.
In Miller's experience deannexations "are usually relatively small areas, but in the case of ... Manor you're dealing with a fairly significant amount of acreage." He calculated the area to be deannexed at about 1,250 acres, and because Avalon was only about 3,142 acres, the annexation of Manor to Avalon would increase Avalon by approximately one-third. While the driving distance from Manor to Avalon was about 1.9 miles, the distance to Swainton, for example, which was the "nearest next settled area" in the Township to Manor, was only two miles.
Under the Township's master plan the areas around Manor were largely devoted to open space and wetlands, important recreational assets which were more "heavily used" than in years past. Both the Township and Manor were "resort communities," with high percentages of seasonal populations. Miller believed there could be twenty-five to forty additional dwelling units built in Manor. But he also saw value in the wetlands areas in fostering "ecotourism," which he defined as the bringing into the Township of tourism dollars based on ecology attributes and interest in the Manor area.
Miller pointed out that important services such as hospital, emergency room and the county aging facilities were located only in the Township, and there was "a much greater variety of stores and shopping opportunities" in the Township overall. He acknowledged that there were shopping opportunities in Avalon, too, but concluded that most Manor residents would utilize services in both communities and that whether Manor was deannexed would "have very little impact on that pattern."
According to Miller, the Township could save about $42,000 per year in police services and $35,000 in public works services if deannexation were approved. But because of "mutual aid agreements and the cooperation that occurs between the various police departments," Miller believed "there would be no major change in the level of police protection in the area."
Miller summarized the benefits and detriments to Manor and the Township from Manor's deannexation as follows: With respect to Manor, 1) there would be little or no impact on emergency services, utility and municipal services, and evacuation *574 patterns; 2) residents would receive a benefit in lower real estate taxes; and 3) residents would experience detriments in the forms of "slightly higher sewer rates," a "potential for non-conformance with the zoning," and a potential for "some financial obligations" resulting from apportionment of the remaining sewer debt. With respect to the Township, 1) there would be little or no impact in emergency services and evacuation patterns; 2) benefits would include "minor savings" for services such as police and public works; and 3) detriments would include loss of 1,250 acres, loss of $32,029,700 in ratables which translated into about $600,000 per year in tax income; loss of future ratables and loss of "permitting and zoning jurisdiction" over an environmentally sensitive area. Miller concluded that deannexation would result in a significant adverse impact on the Township's economic and social well-being.
In June 2001, the Board issued its report. Some of the Board's conclusions weighed in favor of the application. The Board found that deannexation would cause no significant negative social impact to Township schools or negative impact to the Township's sewer utilities and that Avalon's flood management plan was "more advanced" than the Township's.
But most of its determinations militated against deannexation. The chief findings in that regard were "very significant economic consequences" to the schools and Township, the resultant increases in taxes to the remaining residents, the ongoing losses of tax revenues and ratables, and what the Board termed as the "crux" of plaintiffs' application, the " `tax shopping' or avoidance of assessments." It also indicated that the Jerome survey was "flawed and is entitled to little weight." While it referred to a number of other factors, such as emergency services, public works services, and "social bonding" which did not weigh dispositively one way or the other on the deannexation question, the Board noted particular reasons why plaintiffs were unrealistically sanguine in their forecasts for future Township growth and development.
Thus, the Board concluded plaintiffs had not satisfied their burdens to establish that failure to consent to deannexation would be detrimental to the economic and social welfare of the majority of Manor residents, and that deannexation would not cause significant injury to the Township's well-being. Indeed, the Board expressly concluded that deannexation would have a significant negative impact on the Township.
In July 2001, the three-member governing body voted unanimously to deny the petition.

II
Plaintiffs contend the trial court erred when it concluded the Township reasonably refused to consent to deannexation. First, they contend the trial court correctly recognized that failure to consent to deannexation resulted in some economic and social detriments to Manor, and therefore the court erred in concluding that withholding consent was not arbitrary and unreasonable. Such detriments include the deprivation of tax savings to Manor residents and loss of Avalon's dredging and flood control programs. Plaintiffs also point to faster emergency services available to them from Avalon as further support for their contention that their application was motivated by numerous factors to improve the Manor quality of life and cannot be fairly dismissed as "just tax shopping." Second, they argue that the record lacks support for the trial court's conclusion that deannexation would cause significant injury to the Township, pointing particularly to the court's failure to properly *575 appreciate or value the asserted tax-savings factor and listing various ways by which the Township could have recouped any tax revenue lost by deannexation.
Judge Perskie concluded plaintiffs did not establish they would suffer any detriment in emergency services if they continued as part of the Township. But he found that plaintiffs did establish that the lack of dredging and flood control programs in the Township worked upon them an "economic and social" detriment and also acknowledged that Manor residents' having to forego the tax savings resulting from deannexation qualified as a detriment to those residents. The judge, however, rejected plaintiffs' contention that any economic detriment to the Township could be readily ameliorated and was not significant. He then weighed and balanced the detriments and benefits that would flow from deannexation to Manor and the Township and concluded the Township did not act unreasonably in denying the deannexation petition:
The plaintiff argued, to the Planning Board and to the court, that the economic consequences of deannexation could be "softened" by the application to the tax rate of proceeds from the sales of liquor licenses or municipally owned properties; from added assessments; by an improved collection rate; or by the application to the tax rate of a portion of the Township's accumulated surplus. I do not believe that any or all of these techniques may properly be considered as an "amelioration" of the increase in the proportion of local, school, and fire district taxes that would be borne by the remaining taxpayers of the Township in the event of deannexation. In the first place, these approaches are, in the main, "one-time" revenue sources, rather than recurring assets. More importantly, however, whatever revenues are generated by any or all of these activities already belong to all of the property owners of the Township. To suggest that these revenues could be considered as an "offset" or "amelioration" of the added taxes attendant to a deannexation is to suggest that the taxpayers of the Township should apply their own resources to the reduction of the increase in their taxes. Without deannexation, these revenue sources, if realized, would accrue to the benefit of the taxpayers of the Township and would reduce their tax payments below the current levels, or perhaps offset increases unrelated to a deannexation. There is no equitable basis to charge their interest in these revenues with the burden of "offsetting" the increases that would result from deannexation.
Accordingly, in assessing the overall record before me, I conclude that the plaintiff has sustained its burden of showing a "detriment to the economic and social well-being" of the residents of Avalon Manor only with respect to the dredging and flood plain issues, and of course with regard to the tax savings that would accrue to the residents of Avalon Manor from deannexation. There is no other basis in the record that would require the Township to acknowledge such a detriment.
With respect to the statutory standard of avoiding a "significant injury" to the Township, I believe that the record cannot compel a conclusion other than that reached by the Township insofar as the tax impact on the remaining residents of the Township is concerned. Phrased another way, I do not believe that it is the court's proper function to assess the relative "significance" of an annual tax increase of $67.97 or $75.52. I believe that the court's role in this instance is to assess whether the Township's decision was founded in facts established in the *576 record ... and whether that decision was "arbitrary or unreasonable"it was not. It was not unreasonable for the Township to have considered such financial impacts as "significant," especially in view of the tax savings that would accrue to the residents of Avalon Manor from deannexation.
The record does not include any explicit findings or conclusion by the Planning Board or the Township with regard to some of the other possibly relevant considerations relating to the social impact of a deannexation, facts that would address the Township's being deprived of the participation by residents of Avalon Manor "in the religious, civic, cultural, charitable and intellectual activities of the municipality; their meaningful interaction with other members of the community and their contribution to its prestige and social standing; the part they play in general scheme of their municipality's social diversity; and, conceivably, the wholesome effect their presence has on racial integration." Ryan v. Mayor & Council Bor. of Demarest, [64 N.J. 593, 605, 319 A.2d 442, 449 (1974) ]. I therefore cannot ascribe to the Township any concerns about deannexation in these respects. I do note, however, that the properties proposed for deannexation are of a significantly higher value than the general profile of residential properties of the Township, a fact that would suggest implications for the Township's "social diversity" and "prestige and social standing." I think that the loss of such a disportionately highly valued sector of the municipality of necessity would inflict a significant "social injury" on the Township and its ability to continue to attract the kinds of residentsdesirable in any communitythat have successfully developed Avalon Manor.
In summary, the plaintiff has established a "detriment to the economic and social well-being" of the residents of Avalon Manor that the Township considered as insufficient to justify deannexation, especially in light of what the Township views as the "significant injury" that deannexation would inflict on the remaining taxpayers of the Township. I do not find, on this record, that such a conclusion was "arbitrary or unreasonable." I note that the statute permitting deannexation was intended by the legislature to "give precedence to [the] policy ... of preservation of municipal boundaries and maintenance of their integrity against challenge prompted by short-term or even frivolous considerations such as `tax shopping' or avoidance of assessments. It is exactly for this reason that there must be secured the governing body's consent, which may be withheld in the reasonable exercise of its discretion. That safeguard stands in support of the intended policy of the legislature." Ryan, supra, 64 N.J. at 606 [319 A.2d 442].
We agree with this analysis.
The statute governing the procedure for annexation of land in one municipality to that of a second contiguous municipality requires submission of a petition to the governing body signed by at least 60% of the legal voters in the area sought to be annexed, and adoption of a resolution by two-thirds of the governing body of the municipality in which the land is located consenting to the annexation. N.J.S.A. 40A:7-12. Before acting on any resolution pursuant to the petition, the governing body of the municipality where the land is located must refer the matter to its planning board, which must issue a report to the governing body "on the impact of the annexation upon the municipality." Ibid.
*577 In giving or withholding consent to deannexation, governing bodies have traditionally been afforded discretion, but discretion nonetheless subject to judicial review. West Point Island Civic Ass'n v. Township Comm. of Dover Tp., 54 N.J. 339, 347-48, 255 A.2d 237 (1969). Prior to 1982 the burden was on the municipality to prove the unreasonableness of the requested deannexation. Russell v. Stafford Tp., 261 N.J.Super. 43, 46-47, 617 A.2d 685 (Law Div.1992). But in 1982 the Legislature passed L. 1982, c. 182, § 2 ("Refusal to annex; judicial review; burden of proof"), which not only placed the burden on the petitioners but expressed the standards for granting or denying deannexation and annexation:
In any judicial review of the refusal of the governing body of the municipality in which the land is located or the governing body of the municipality to which annexation is sought to consent to the annexation, the petitioners have the burden of establishing that the refusal to consent to the petition was arbitrary or unreasonable, that refusal to consent to the annexation is detrimental to the economic and social well-being of a majority of the residents of the affected land, and that the annexation will not cause a significant injury to the well-being of the municipality in which the land is located. [N.J.S.A. 40A:7-12.1.]
The municipality's exercise of discretion is "subject to review under the standard principles of arbitrariness or unreasonableness." Russell, supra, 261 N.J.Super. at 48, 617 A.2d 685. The statutory language imposes upon the petitioners the same burden of showing an abuse of discretion whether their challenge is to the actions of either the deannexing or annexing municipality. Id. at 49, 617 A.2d 685.
In Russell, Judge Serpentelli explained that under the revised statute petitioners now have the burden to show "annexation will not cause a significant injury to the well-being of the deannexing municipality," which is different from "the initial burden being upon the deannexing municipality to prove that it will be injured." Ibid. He interpreted the amended statute "to have imposed a heavier burden on the petitioners, thereby making deannexation more difficult or, perhaps, discouraging attempts to undertake the effort at all." Id. at 50, 617 A.2d 685.
As a general matter, in reviewing decisions of local boards our courts recognize that such bodies have particular knowledge of local conditions and are therefore extended "wide latitude in the exercise of their delegated discretion." Booth v. Board of Adj. of Rockaway Tp., 50 N.J. 302, 306, 234 A.2d 681 (1967). The law presumes that municipal governing bodies "will act fairly and with proper motives and for valid reasons." Kramer v. Board of Adj. of Sea Girt, 45 N.J. 268, 296, 212 A.2d 153 (1965). Thus, where the action challenged on appeal involves the exercise of discretion, the standard of review affords the municipal body's determination substantial deference:
Courts cannot substitute an independent judgment for that of boards in areas of factual disputes; neither will they exercise anew the original jurisdiction of such boards or trespass on their administrative work. So long as the power exists to do the act complained of and there is substantial evidence to support it, the judicial branch of the government cannot interfere.
[Ibid.]
Local action will be reversed only if arbitrary, capricious or unreasonable. See ibid. (applying standard to local zoning determination). "Arbitrary and capricious" is typically understood to mean *578 "willful and unreasoning action, without consideration and in disregard of circumstances." See Beattystown v. Department of Envtl. Prot., 313 N.J.Super. 236, 248, 712 A.2d 1170 (App.Div.1998) (applying standard to DEP agency action).
Plaintiffs concede that the governing body had discretion as to whether to grant the petition for deannexation. They also agree that decisions of local bodies generally are sustained where the record contains adequate evidence to support such determinations. They principally take issue with the trial court's construction of the phrase "significant injury" in N.J.S.A. 40A:7-12.1 as it relates to any detriments from deannexation, arguing that the court placed too much emphasis on the negative impacts the Township might experience. Defendant acknowledges that plaintiffs have shown that deannexation would benefit Manor residents in terms of "significant saving[s] on real estate taxes," flood insurance rates and dredging services, and thereby effectively satisfied the second N.J.S.A. 40A:7-12.1 criterion (refusal to consent is detrimental to the economic and social well-being of a majority of Manor residents). But defendant claims plaintiffs have not met the remaining requirements under N.J.S.A. 40A:7-12.1, namely that the governing body's refusal to consent was arbitrary and that deannexation will not create a significant injury to the Township's well-being. The competing contentions can only be resolved by reference to the pre- and post- N.J.S.A. 40:7-12.1 case law.
There are very few reported New Jersey opinions on a municipality's withholding consent to deannexation or annexation. The two leading cases were both decided before the Legislature enacted N.J.S.A. 40A:7-12.1. In West Point Island Civic Ass'n v. Township Comm. of Dover Tp., supra, 54 N.J. at 342, 255 A.2d 237, the Court reviewed Dover Township's refusal to consent to the deannexation of the West Point Island area (West Point). The area at issue was a small one-half-mile square island and the only access to it was over a bridge from Lavallette, which was the municipality to which West Point sought annexation and which had expressed the intention to act favorably on West Point's petition. Id. at 343 n. 2 and 344, 255 A.2d 237.
After first determining that under N.J.S.A. 40:43-26, the predecessor to N.J.S.A. 40A:7-12, a municipality had discretion in deciding whether to consent to petitions for deannexation but that such discretion was not unbridled, the Court addressed the merits of West Point's petition. Id. at 345-47, 255 A.2d 237. Turning to Dover's asserted reasons for withholding consent, the Court first rejected the claim that the mere provision by Dover of municipal services to West Point in the past could serve as justification for refusing to permit deannexation. Id. at 348, 255 A.2d 237. It then rejected the claim that approval of West Point's application "would be setting a precedent for the possible secession of other areas from the municipality." Ibid. In fact, the Court expressed that overall, "[a]s proof of injury, Dover Township has not come forward with the slightest justification, other than that of sentimental resistance, for the withholding of consent." Ibid. Although the Court acknowledged that deannexation would reduce Dover ratables by 1.737%, the trial court found, and the Court agreed, that "this loss would be offset by an equivalent reduction in cost of municipal services." Id. at 348-49, 255 A.2d 237. It likewise rejected the suggestion that deannexation would create "inconvenience of adjusting municipal services," noting that a Dover Sewerage Authority representative had said that sewerage disposal service to West Point "would be totally *579 unaffected" by deannexation. Id. at 349, 255 A.2d 237.
With respect to the claim that deannexation would serve as a detriment to Dover's overall sense of community, the Court had this to say:
Finally, we do not believe that the deannexation of West Point Island would alter in any appreciable way the character of Dover Township as a community. West Point Island is on the other side of Barnegat Bay, isolated from the schools as well as the governmental, business and shopping areas of Dover Township. The residents of West Point Island naturally look to the contiguous Borough of Lavallette as the focus of community interest and activity. The record shows that the West Point Islanders use Lavallette recreation facilities, and the Lavallette Borough Hall for community meetings. Since Dover Township is not being economically or socially injured by the deannexation, and the geography is so pointedly in favor of allowing it, on the facts of this case there is no reason to deny the overwhelming majority of voters and taxpayers on West Point Island the opportunity of joining the Borough of Lavallette.
[Id. at 349-50, 255 A.2d 237 (emphasis added).]
A few years after West Point, the Court applied the same standards to reach the opposite result. Ryan v. Mayor & Council of the Bor. of Demarest, 64 N.J. 593, 319 A.2d 442 (1974). In that case the area at issue, Beechwood Farms, was a development of about thirty expensive homes which was bisected by the borderline between Demarest and Alpine Borough in Bergen County. Id. at 596, 319 A.2d 442. The petitioners were fourteen of the sixteen Beechwood Farms property owners whose lots lay in Demarest. Ibid. Demarest refused its consent to deannexation. The Court noted that while Alpine and Demarest were adjacent boroughs and both mostly residential, Demarest was about two square miles with a population of 6,262, while Alpine was approximately 5.3 square miles but had a smaller population of 1,344. Id. at 597, 319 A.2d 442. Demarest had a shopping center and no industry. Alpine had no stores but an antique shop and some filling stations. Ibid. Demarest's total tax assessment was $45.5 million, compared to Alpine's $27.6 million. Ibid. Both municipalities had grammar schools; Demarest was the site of a regional high school, but Alpine's students attended Tenafly High School. Ibid. Beechwood Farms had a homeowners association, and residents "perceive themselves as a community despite the fact that they straddle the two Boroughs." Id. at 598, 319 A.2d 442. The Demarest section of Beechwood Farms was separated from the rest of the municipality by a country club and a private school, and passage from that section to the rest of the town required crossing into Alpine and passing "briefly" through another borough before returning back to Demarest. Ibid.
Moreover, the Demarest Beechwood Farms homes were "much more expensive than the average home" elsewhere in Demarest. Ibid. For example, while those sixteen homes accounted for only 1.03% of the total homes in Demarest, in 1971 they accounted for 2.11% of the total valuation, including commercial property. Ibid. The Beechwood Farms homes provided $45,100 to Demarest in property taxes, and it was undisputed that the taxes for those same homes would be "significantly lower" if they were located in Alpine. Ibid.
The evidence indicated that the savings to Demarest in municipal services from deannexation would not offset the revenue loss, and as a result the tax rate for the *580 remainder of Demarest would have to be increased following deannexation. Id. at 599, 319 A.2d 442. Other evidence indicated that Demarest had future development plans in which Beechwood Farms figured, that Beechwood Farms had been active in Demarest social, community and political activities, and that the "movement for deannexation began only when it became apparent that Demarest would be required to have a bond issue to finance a sewer system" the State had ordered it to build. Ibid.
The Court then noted its earlier opinion in West Point, but distinguished the result there on the bases that Beechwood Farms was not "isolated from the remainder" of the township as was the West Point community, that in West Point the residents looked to the municipality to which they sought annexation as the "focus of community interest and activity," and that the loss in municipal revenue "was offset by an equivalent reduction in the cost of municipal services." Id. at 602, 319 A.2d 442. Those circumstances, however, were not present in the matter with Beechwood Farms. Id. at 603, 319 A.2d 442.
The Court acknowledged the relationship between the value of the properties sought to be deannexed and the social detriment resulting from secession:
It is also acknowledged that Beechwood Farms constitutes an affluent community whose presence adds prestige to the Borough of Demarest. This is not an inconsiderable factor in determining whether social detriment would result from deannexation, nor can it be lightly dismissed as mere "snob appeal" and thus unworthy of consideration.
[Ibid.]
In commenting on the fact that the Beechwood Farms homeowners contributed "substantially more" in taxes to the township than they cost in services, the Court expressed that "[t]he municipal fathers quite properly considered the amount of both the long term and the short term loss of revenue in determining that the proposed deannexation would mean economic injury to the Borough." Ibid. That conclusion was legitimate notwithstanding that the evidence "does not lend itself to a precise computation of the loss of revenue above the cost of services for the development." Ibid. The Court concluded that under the precursor to N.J.S.A. 40A:7-12 and -12.1 the Borough had successfully met its burden of showing that deannexation would be injurious to the social and economic well-being of the municipality, and that its "justifications for refusal to consent have much more substance than the mere `sentimental resistance' which was found in [West Point]." Id. at 604, 319 A.2d 442.
Recognizing a need to address how these issues should be handled in future cases, the Court added a discussion of a number of relevant factors which could come into play in deannexation matters. Ibid. For example, in commenting upon the relative ease of showing economic injury but the difficulty of establishing "social detriment," the Court set forth a non-exclusive list of considerations that might inform the determination:
[W]e would suggest that social detriment might be found in a community's being deprived of the petitioner's participation in the religious, civic, cultural, charitable and intellectual activities of the municipality; their meaningful interaction with other members of the community and their contribution to its prestige and social standing; the part they play in [the] general scheme of their municipality's social diversity; and, conceivably, the wholesome effect their presence has on racial integration.
[Id. at 605, 319 A.2d 442.] *581 The Court acknowledged, however, the argument that those were values which could be in flux and weighted differently by the municipality at different times. Ibid.
Finally, the Court rejected the argument that the legislative history behind the annexation statutes indicated a belief that " `more effective home rule can be achieved by adjusting the boundaries [of municipalities] from time to time to conform with the community of interests of the residents of particular areas.' " Id. at 606, 319 A.2d 442 (citations omitted). Rather,
[w]e find in the statute an intention on the part of the Legislature to give precedence to a more significant policy, that of preservation of municipal boundaries and maintenance of their integrity against challenge prompted by short-term or even frivolous considerations such as "tax shopping" or avoidance of assessments. It is exactly for this reason that there must be secured the governing body's consent, which may be withheld in the reasonable exercise of its discretion. That safeguard stands in support of the intended policy of the legislature.
[Ibid.]
And see Pane, New Jersey Practice § 6.12 at 235 (3d ed.1999) (the author implies that the Court's observation in Ryan of legislative intent would apply with equal force to N.J.S.A. 40A:7-12.1).
Following West Point and Ryan, very few deannexation opinions have been reported, and most that have involved the prior statute, N.J.S.A. 40:43-26. See e.g., Carton v. Tinton Falls, 177 N.J.Super. 404, 411-12, 426 A.2d 1056 (App.Div.1981) (court concludes that under N.J.S.A. 40:43-26 both West Point and Ryan place the burden of going forward with proof of social or economic injury on the municipality, once a request for deannexation is made).
The only reported opinion on deannexation since the 1982 amendments is Russell, supra, 261 N.J.Super. at 47-48, 617 A.2d 685. Russell is distinguishable on its merits, because there review was sought not of a municipality's refusal to consent to deannexation but to the neighboring municipality's refusal to consent to annexation after the "sender" municipality had already consented to deannexation. Id. at 44-45, 617 A.2d 685. Noting that it was "clear that financial considerations are at the heart of this controversy," meaning that the impending installation of mandated sewers in the section for which deannexation had been sought was the "impetus for the present action," the court concluded that the annexing municipality did not abuse its discretion in refusing to consent to annexation. Id. at 56-58, 617 A.2d 685. Although the defendant-township would realize a tax revenue increase if it consented to annexation and its municipal utilities authority would experience but "a small increase" in sewer charges which worked out to about only an eight-dollar a year rate addition, the court nonetheless noted that defendant-township could also give considerable weight to other financial-related concerns. Id. at 57, 617 A.2d 685.
For example, while the initial increases in annual sewer rates were not substantial in and of themselves, the defendant-township was not unreasonable in balancing those increases against "the anticipated cost involved in the construction of the Cedar Run Dock Road sewer work in [the defendant municipality] as well as the future expansion costs of the sewer system to other outlying areas of [the defendant municipality]." Ibid. Thus, the court could not "find that there [was] any real financial benefit" to the defendant municipality in agreeing to annex the Cedar Run Dock *582 Road area, and found that it was reasonable for the defendant to have concluded the petition was based on "nothing mote than a request to have it assume [the deannexing municipality's] headache, a significant sewer assessment." Id. at 58, 617 A.2d 685. It therefore dismissed the plaintiffs' complaint. Id. at 61, 617 A.2d 685.
Application of these principles supports the conclusion that here the Township did not act arbitrarily in denying deannexation. The Township appropriately considered the economic detriment it would suffer with the loss of the Manor ratables, and the record supports its conclusion that the loss would not be offset by any savings resulting from deannexation. Plaintiffs' suggestions that the Township could achieve additional revenues through such means as the sale of municipally owned property, the issuance of a liquor license and other such devices ring hollow. Such measures are unrelated to deannexation, and any revenues derived from such means are available to the Township and all of its residents whether deannexation occurs or not. This is not an offset against revenues lost as a result of the proposed deannexation. Further, any such measures represent one-time only revenue sources, and would not serve to offset the loss in perpetuity of Manor ratables. Likewise, although it cannot be denied that the Township as a whole is not static but in a growth mode, the Township reasonably concluded that substantial increased ratables in the Manor are reasonably anticipated, based upon recent sales data and the construction of expensive homes and additions there.
We are satisfied that the local officials, after conducting multiple public hearings, receiving extensive evidence and public input, and considering relevant and appropriate factors, did not act arbitrarily or unreasonably. The Township's conclusions were not arbitary as that standard is set forth in N.J.S.A. 40A:7-12.1. And see Worthington v. Fauver, 88 N.J. 183, 204-05, 440 A.2d 1128 (1982) ("Where there is room for two opinions, action is [valid] when exercised honestly and upon due consideration even though it may be believed that an erroneous conclusion has been reached")(citing Bayshore Sewerage Co. v. Department of Envtl. Prot. 122 N.J.Super. 184, 199, 299 A.2d 751 (Ch.Div. 1973), aff'd, 131 N.J.Super. 37, 328 A.2d 246 (App.Div.1974)).
We find no merit to additional arguments advanced on appeal by plaintiffs that the Planning Board failed to consider N.J.S.A. 40A:7-17 ("Indebtedness of annexed municipality apportioned") and that a comment by the mayor at a Township meeting on December 6, 1999 (indicating that he would "never cut that off and give it to Avalon") demonstrated biased and arbitrary conduct. On the former point, the Board expressly found that deannexation "would have ... little effect on" the Township's sewer utility if the Township were compensated for its prior investments in Manor's sewer system. Therefore, the Board did consider this issue. On the latter point, we find the mayor's comment isolated and inconsequential in the context of this comprehensive process.
The record supports the Township's conclusion that the loss of tax revenues, control over natural wetlands, and the intangible enhancements to the municipality of one of its nicest areas constituted a "significant injury" to the well-being of the Township. N.J.S.A. 40A:7-12.1. The record further supports the Township's conclusion that this injury outweighed any benefits to Manor; therefore, the Township's ultimate decision to deny deannexation was not arbitrary or unreasonable. Ibid.

*583 III
We next consider plaintiffs' argument that the trial judge erred by not limiting the proofs to the assessed values of the "preceding year." They argue that the reference in N.J.S.A. 40A:7-12, setting forth the information required in a petition for deannexation and referencing "the assessed value of the real estate contained within the boundaries for the preceding year" necessarily limited consideration of assessed values to those for the year preceding the petition. The petition here was filed in May 2000. The Planning Board and the trial court considered assessed valuations for 1999 and 2000. Although it is unclear whether plaintiffs now contend that the proofs should have been limited to 1999 or 2000, it is clear that they object to consideration by the Board and the trial court of post-2000 values and related economic factors. Plaintiffs contend this was speculative and beyond what the Legislature intended in enacting N.J.S.A. 40A:7-12.
We agree with Judge Perskie that such a narrow reading of the statute is not warranted. The court's duty in construing a statute is to determine the Legislature's intent. AMN, Inc. of New Jersey v. South Brunswick Tp. Rent Leveling Bd., 93 N.J. 518, 525, 461 A.2d 1138 (1983). Where the statute's words are "clear and explicit," courts do not resort to extrinsic materials to determine that the Legislature "intended something other than what it actually expressed." Gauntt v. City of Bridgeton, 194 N.J.Super. 468, 483, 477 A.2d 381 (App.Div.1984), rev'd on other grounds, Falcone v. DeFuria, 103 N.J. 219, 510 A.2d 1174 (1986). Where it is clear that the "drafters of a statute did not consider or even contemplate a specific situation," the court construes the statute in accordance with the probable intent of the Legislature had it anticipated the situation at issue. AMN, supra, 93 N.J. at 525, 461 A.2d 1138. In that case interpretation will not depend upon a technical reading but rather the legislation's objectives and the "commonsense of the situation." Jersey City Chapter of the Prop. Owner's Protective Assoc. v. City Counc. of Jersey City, 55 N.J. 86, 100, 259 A.2d 698 (1969).
The deference generally extended by appellate courts to the trial judge with respect to findings of fact at a bench trial does not extend to legal conclusions, which are reviewed de novo. J.N.S. v. D.B.S., 302 N.J.Super. 525, 530, 695 A.2d 730 (App.Div.1997). And see Manalapan Realty, L.P. v. Township Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995) ("A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference"). In this case application of N.J.S.A. 40A:7-12 was a question of law.
We reject plaintiffs' assertion that the "future loss of tax revenues" could not be considered in reviewing their petition based on the wording of the statute. We do not agree with their contention that future economic contingencies were too speculative and remote to serve as factors in any determination.
The "preceding one year" language to which plaintiffs point merely describes information that must be submitted with the petition. N.J.S.A. 40A:7-12. Nothing in the section addresses the proofs to be considered before the board or the governing body. Moreover, in the second and final paragraph of N.J.S.A. 40A:7-12 the governing body is to refer the petition to the planning board, which is to "report ... on the impact of the annexation upon the municipality." N.J.S.A. 40A:7-12. Nothing expressly or impliedly limits the evidence *584 which the board or governing body is to consider.
Further, N.J.S.A. 40A:7-12.1, setting forth, among other things, the standard of judicial review and that the petitioners have the burden of proof, continues the theme of N.J.S.A. 40A:7-12 by expressing that it must be determined what detriments exist to the economic and social well-being of the residents in the affected land and whether annexation will cause a "significant injury to the well being" of the municipality from which secession is sought. N.J.S.A. 40A:7-12.1. N.J.S.A. 40A:7-12 was amended and N.J.S.A. 40A:7-12.1 passed as part of the same Act. L. 1982 c. 1982 §§ 1 and 2. They are portions of a legislative scheme, and therefore must be considered together. In re Adoption of a Child by W.P., 163 N.J. 158, 168, 748 A.2d 515 (2000).
Clearly the intent of the Legislature in enacting these laws governing deannexation and annexation of municipal lands was to require that the decision not be made in a vacuum or on narrow grounds, but after consideration of all relevant circumstances. For example, consideration of the "well-being" of both the residents seeking deannexation and of the municipality from which secession is sought requires reflection upon a broad spectrum of factors. Those circumstances, in turn, should reasonably extend beyond the particular facts as of the date of the petition. Plaintiffs' argument would require the decision on deannexation to be based on the situation as though a picture could be taken at the end of the preceding year and the conclusion on deannexation drawn only from that one snapshot. It neglects to recognize that a fair analysis of the residents' and municipalities' well-being necessarily involves consideration of economic and social factors over time, and the prospect for and likelihood of change. It is, therefore, an evaluation that must, to some extent, be informed by considerations that go beyond only the year preceding the petition. Put differently, the economic information from the assessed valuations of the year preceding the petition is of little value to the determination of whether deannexation is advisable without at least some reference to the period in which the petition is made. That period could be two or three years, or even several more, perhaps, under particular circumstances. But it would necessarily have to extend beyond just a single year in order to be meaningful. The evaluation implicates a dynamic consideration, not merely a "snapshot."
For example, what if, in the preceding year, the municipality suffered some highly unusual setback or good fortune which drastically affected real estate values or municipal expenses, but only in the immediate term? In that case, certainly, it would be unreasonable to confine the analysis to that one year's data. As Judge Perskie noted, the breadth of considerations which the Court expressed in Ryan as relevant to the deannexation issue was not confined to a particular tax year or period. Ryan, supra, 64 N.J. at 605, 319 A.2d 442. And plaintiffs had a full opportunity to place before the Board whatever evidence they deemed appropriate to refute that the Township would suffer significantly in the near future if deannexation were permitted.
Plaintiffs' argument in this regard is at odds with their argument that the Township and trial court erred by refusing to credit the municipality's likely future growth and development. Reading the statute as plaintiffs urge would effectively create the absurd result of having to make a determination about the municipality's future well-being without being able to consider its future well-being, and interpretations of statutes "which lead to absurd *585 or unreasonable results are to be avoided." Davis v. Heil, 132 N.J.Super. 283, 293, 333 A.2d 537 (App.Div.), aff'd, 68 N.J. 423, 346 A.2d 405 (1975).
Plaintiffs acknowledge that in Ryan the Court expressed how in that case "the municipal fathers quite properly considered the amount of both the long term and short term loss of revenue in determining that the proposed deannexation would mean economic injury to the Borough," but they distinguish such a principle by noting that at the time Ryan was decided the burden was on the municipality to establish that economic injury would occur. Because the burden is now on petitioners under N.J.S.A. 40A:7-12, they claim, Ryan has limited authority.
Plaintiffs point to nothing in the statute, the Committee Statement or the legislative history to indicate that in enacting N.J.S.A. 40A:7-12 the Legislature intended to invalidate in any way the principles expressed in Ryan. The Legislature is presumed to be aware of "relevant case law when it enacts statutes." Guzman v. City of Perth Amboy, 214 N.J.Super. 167, 174, 518 A.2d 758 (App.Div.1986). By enacting N.J.S.A. 40A:7-12 and N.J.S.A. 40A:7-12.1 the Legislature expressly switched the party with the burden of proof in deannexation matters. The burden of proof issue was critical in the earlier Ryan and West Point decisions. It is unreasonable to assume that in enacting these statutes the Legislature intended to confine the proofs to the year before the petition in the absence of expressing as much.
We are satisfied that a sensible reading of the statute, in conjunction with Ryan and West Point, allows for consideration of economic impact in the reasonably foreseeable future as a legitimate deannexation factor. The Township was correctly permitted to consider this factor, along with other relevant factors in its overall evaluation.
Affirmed.