FRANK RYAN AND ANNA M. RYAN, HIS WIFE; ROBERT A. ESCHER AND JANE W. ESCHER, HIS WIFE; VINCENT BOGERT AND MARIE C. BOGERT, HIS WIFE; JOHN R. FRERCKS AND VIRGINIA FRERCKS, HIS WIFE; EMILE R. CAPITA; WILLIAM M. BUCH AND FRANCES V. BUCH, HIS WIFE; EDWARD F. PRODIGO AND DOROTHY PRODIGO, HIS WIFE; CARL M. CARLSON AND MILDRED M. CARLSON, HIS WIFE; CONSTANCE T. CORY; GRANT DELLABOUGH AND DOROTHY DELLABOUGH, HIS WIFE; AND WILLIAM NIXON AND FRANCES NIXON, HIS WIFE, PLAINTIFFS-RESPONDENTS, v. MAYOR AND COUNCIL OF THE BOROUGH OF DEMAREST, IN THE COUNTY OF BERGEN, STATE OF NEW JERSEY, DEFENDANT-APPELLANT.

Argued December 4, 1973—Decided May 8, 1974.

594

Mr. *William A. Fasolo,* argued the cause for appellant (Mr. *Thomas E. Durkin, Jr.,* of counsel and on the brief).

Mr. *James A. Major, II,* argued the cause for respondents, (Mr. *Alfred D. Schiaffo,* attorney; Mr. *William Miller,* of counsel and on the brief).

The opinion of the court was delivered by

CLIFFORD, J. Beechwood Farms is a development of what are described in the record as thirty "beautiful homes, large estates," bisected by the borderline between the Borough of Demarest and the Borough of Alpine in Bergen County. Sixteen of the homes are consequently in Demarest and fourteen are in Alpine.

The plaintiffs here are fourteen of the sixteen Beechwood Farms homeowners whose properties lie in Demarest. On January 4, 1971 they filed a petition with the Mayor and Council of Demarest, pursuant to *N. J. S. A.* 40:43-26, requesting consent to deannexation of that part of the development which is located in that Borough so that "said lands * * *

may become part of the Borough of Alpine * * *."[1] On May 17, 1971 the Council adopted a resolution refusing to grant its consent, declaring that deannexation "would be contrary to the best interest of the Borough of Demarest and its general public and welfare * * *." Plaintiffs then filed a complaint in lieu of prerogative writ under *R.* 4:69 in the Superior Court, Law Division, to compel the Council to grant its consent. Judgment was rendered in their favor at the trial level. The Appellate Division affirmed in an unreported opinion. We granted certification, 63 *N. J.* 563 (1973), to expand upon our interpretation of the aforementioned statute in *West Point Island Civic Association v. Township Committee of Dover Township,* 54 *N. J.* 339 (1969). For a full understanding of our conclusion leading to a reversal, it is necessary to recite at the outset and in some detail the factual background.

As indicated Demarest and Alpine are adjacent boroughs. Demarest is about 2 square miles and had a population in 1970 of 6,262;[2] Alpine is about 5.3 square miles and had a population of 1,344. At the time of trial Demarest was 90% residential; it had a shopping center but no industry. Alpine was almost entirely residential with no stores, other than an antique shop, and some gasoline stations.

In 1971 Demarest's total tax assessment was about $45.5 million, while Alpine's was about $27.6 million. The tax rate that year was $4.70 per $100 of valuation in Demarest and $2.67 per $100 in Alpine.

Both Demarest and Alpine maintain grammar schools. Demarest high school students attend Northern Valley Regional High School, located in Demarest. Alpine high school students are forwarded to Tenafly High School.

---

[1] The record nowhere reveals the intention of the governing body of Alpine with respect to annexation should Demarest give its consent. At oral argument counsel for the parties were unable to supply that information.

[2] The Mayor of Demarest testified a revised census, neither "approved" nor "certified," put the number at about 5300 people.

The .exclusive development of Beechwood Farms has a Beechwood Farms Association which charges dues to its members and which maintains a swimming pool, fishing lake and picnic grounds for their use. The residents perceive themselves as a community, despite the fact that they straddle the two Boroughs.

The Demarest section of Beechwood Farms lies on the eastern boundary of the Borough. It is separated from the rest of Demarest by Aldecress Country Club and Holy Angels Academy. In order to get to the business section of Demarest or other residential sections of the Borough, one must cross over into Alpine, pass briefly through the Borough of Cresskill and return to Demarest. The development lies about two miles from the center of the Borough.

It is undisputed that the Beechwood Farms homes located in Demarest are much more expensive than the average home elsewhere in the Borough. In 1971 the development accounted for only 16 homes out of approximately 1,547 homes in Demarest or 1.03% of the total. Nevertheless, it provided $959,000 in assessed valuation in the Borough or 2.11% of the total valuation, including commercial property. The Beechwood Farms homes provided $45,100 to Demarest in property taxes. It is also undisputed that the property taxes for the same homes would be significantly lower if they were located in Alpine.

At trial, the technical sufficiency of the petition and compliance with the statute were conceded by the defendant Borough. The only issue was whether the refusal of Demarest to consent to deannexation was arbitrary and unreasonable under *West Point Island Civic Association v. Township Committee of Dover Township, supra.* Plaintiffs rested their main case without presenting any witnesses, relying on the petition to the Council, the complaint and the pretrial order which narrowed the issues in the case. The denial of Demarest's motion for judgment at this juncture was proper, as will appear in the discussion below.

The defendant municipality called as witnesses the borough accountant, the mayor, and the borough engineer. Their testimony revealed that the elimination of sixteen homes would not produce any reduction in the municipality's operating costs — that is, Demarest could not hire one fewer policeman, fireman or road man after deannexation. The operating costs would remain fairly constant. Likewise, there would be no substantial economy in the budget of the grammar schools as a result of deannexation, although Demarest would save $9,600 to 12,000 in costs for the high school students (different cost figures were supplied by the accountant and the mayor) and there would be a saving in county taxes. These savings would not offset the loss of revenue. In the final analysis, the tax rate for the remainder of Demarest would be increased as a result of the deannexation of Beechwood Farms.

Mayor Ringelstein stated that in reaching its decision the Council considered both the loss in revenue in the upcoming fiscal year and the total loss over the next ten to twenty years and concluded that deannexation would result in an economic hardship. He asserted further that the development figured prominently in the planning of the Borough. The Aldecress Country Club was zoned for residential housing. If and when that land is developed, Demarest plans to use the Beechwood Farms roads as the best thoroughfares out to Hillside Avenue, a county road.

According to the Mayor, residents of Beechwood Farms had been active in Demarest social and community activities such as Little League and had participated in municipal and political activities. The movement for deannexation began only when it became apparent that Demarest would be required to have a bond issue to finance a sewer system which the State Board of Health has ordered the Borough to install. The borough engineer testified the sewer system was undergoing installation at the time of trial.

Two of the plaintiffs testified in rebuttal. Emile R. Capita said that the Demarest schools which his children

attend are 2.4 and 2.9 miles from the development, while the Alpine school would be only 1.1 mile away. However, the children rode to school in Demarest on a school bus and would have to walk to the Alpine School. He also pointed out that the police and municipal services in Demarest are 2.4 miles from Beechwood while the Alpine services are one mile away. The tax savings of being in Alpine rather than Demarest were said to be "irrelevant" to him. His concern was for his children who sometimes stayed after school and had a long walk home to Beechwood and who felt isolated from their friends living in other sections of Demarest.

William M. Buch testified that he lived in Alpine from 1949 to 1962 when he moved to Beechwood Farms. At that time he was unable to purchase an Alpine home and bought one in Demarest. He favored deannexation so that he could reside in the town where he had previously lived.

It was in this posture of the proofs that the trial judge concluded that the effect of deannexation would be "insignificant" and "not of any injury * * * to the municipality." Accordingly, he gave judgment to plaintiffs and ordered Demarest to "adopt a resolution in the form necessary to indicate its consent to the Petition for Annexation * * *." The Appellate Division's affirmance was predicated on agreement with the finding that deannexation would not "specifically injure the municipality or its social and economic well-being."

The trial judge demonstrated a full understanding of all facets of the holding in the *West Point Island* case, but we are satisfied that he and the Appellate Division misapplied to this case the law set forth therein. This Court there undertook to interpret *N. J. S. A.* 40:43–26, reading in full as follows:

Land being in one municipality may be annexed to another municipality to which said land is contiguous. To effect such annexation, a petition in writing shall be presented to the governing body of the municipality to which such annexation is sought to be made, specifically setting forth the boundaries of such land, signed by at

least sixty per cent of the legal voters residing thereon. In case no voter resides thereon, such petition may be signed by the person or persons owning at least sixty per cent of said land as shown by the assessor's duplicate for the preceding year. Such petition shall be duly verified by one of the signers thereof, and shall have attached thereto the oath of an assessor of the municipality in which said land is located, or of some other person having access to such assessor's books, setting forth the assessed value of the real estate contained within such boundaries for the preceding year, and the amount of real estate assessed to any of the persons whose names are signed to such petition. *Such petition shall also have attached thereto a certified copy of a resolution of the governing body of the municipality in which said land is located, consenting to said annexation, which resolution said governing body is hereby authorized and empowered to adopt.*

The governing body of the municipality to which land is sought to be annexed may, in its discretion, by ordinance adopted by a two-thirds vote annex the land specifically described in said petition to such municipality; and in case such municipality is divided into wards, shall also in such ordinance designate the ward or wards of which said land shall become a part, but in all cases the annexed lands shall become part of the ward or wards to which it is contiguous. The boundaries of such municipality shall not be extended so as to include a portion of any county other than that in which such municipality is located. (emphasis supplied)

■ *West Point Island* held that the municipality's consent to deannexation is neither a purely ministerial act nor a purely political judgment reviewable only upon a showing of fraudulent abuse of discretion. Rather, the word "consent" implies a voluntary act, not a statutory compulsion, and the municipality has discretion to withhold its consent to the deannexation. However, the discretionary authority is subject to close judicial scrutiny to prevent arbitrary and unreasonable action, *West Point Island Civic Association v. Township Committee of Dover Township, supra,* 54 *N. J.* at 345–346, and if the municipality in which the land is located is to object to deannexation, it "must come forward" with "proof of specific injury." *Id.* at 348. In this connection we recognize that *West Point Island* speaks at one point of injury to the "social *and* economic" well-being of the municipality, *West Point Island Civic Association v. Township Committee of Dover Township, supra,* 54 *N. J.* at

348, and at another point of the Township not being "economically *or* socially" injured, *id.* at 350 (emphasis supplied). Proof of either economic or social injury, substantial in nature, is sufficient to satisfy the municipality's burden of coming forward with the evidence and there need not be a showing of both. It is likewise conceivable that there be both economic and social detriment, neither of which standing alone would be considered "substantial" but the total of which taken together would work a substantial injury on the community were deannexation allowed.

In *West Point Island* the defendant municipality failed to meet this burden of production and so the Court never reached the question of burden of proof. We think it clearly implicit in that opinion that the ultimate burden of proving that the municipality acted in an arbitrary or unreasonable manner remains with the plaintiffs, the side challenging the invalidity of the withholding of consent. Lest there be any doubt on that score, we specifically declare that such is the burden of plaintiffs. Indeed, it is precisely because of their failure to have sustained that burden in the case *sub judice* that these plaintiffs must fail in their effort to compel Demarest's consent to deannexation.

Comparison with *West Point Island's* facts, where consent to deannexation was ordered, is instructive. There the island, a part of Dover Township, was located across Barnegat Bay, east of the mainland of the Township, and connected by a short bridge to Lavallette, the municipality to which the residents sought to be annexed. The island was "isolated from the schools as well as the governmental, business and shopping areas of Dover Township." The residents looked to Lavallette "as the focus of community interest and activity." Under these circumstances it was held that Dover Township would not suffer any social injury as a result of deannexation. Likewise, the Court found no economic injury to the Township from deannexation; the loss in revenue was offset by an equivalent reduction in the cost of municipal services.

Here, however, Beechwood Farms is not isolated from the remainder of Demarest as West Point Island was isolated from Dover Township. The geography and logistics of the situation do not compel the conclusion that the land in question more naturally belongs to the municipality to which deannexation is sought. In an area of the state where many small municipalities intertwine with one another, we cannot say that Alpine is the natural focus of social activity for the residents of Beechwood Farms in the same way that Lavallette was unquestionably the natural focus of West Point Island due to the most unusual geography in that case. While the residents may prefer to live in Alpine, they did participate in Demarest's political, social and church activities.

▮ It is also acknowledged that Beechwood Farms constitutes an affluent community whose presence adds prestige to the Borough of Demarest. This is not an inconsiderable factor in determining whether social detriment would result from deannexation, nor can it be lightly dismissed as mere "snob appeal" and thus unworthy of consideration.

▮ The evidence also makes it clear that deannexation would indeed cause economic hardship to Demarest. While the testimony does not lend itself to a precise computation of the loss of revenue above the cost of services for the development other than has been set forth *ante,* it is certain that the owners of these exclusive and expensive homes contributed substantially more to the Borough than they cost in services. (What is clearly inferable from the record, plaintiff Capita to the contrary notwithstanding, is that plaintiffs sought deannexation primarily because it would save them considerable money, the property tax rate in Alpine being significantly lower than in Demarest, where they feared an additional burden because of sewer installation.) The municipal fathers quite properly considered the amount of both the long term and the short term loss of revenue in determining that the proposed deannexation would mean economic injury to the Borough.

Thus, we conclude that the Borough of Demarest did meet its burden of coming forward with reasons why deannexation would be injurious to it. It showed injury to both the social and economic well-being of the municipality. Its justifications for refusal to consent have much more substance than the mere "sentimental resistance" which was found in the Township of Dover in the *West Point Island* case. Nothing offered thereafter by plaintiffs tended to rebut the proof of both social and economic injury to Demarest, and consequently the plaintiffs did not prove any arbitrary or unreasonable color to Demarest's refusal to consent to deannexation.

While this disposes of the matter in controversy, we think it well to add a few words with the thought that municipal attorneys, governing bodies, others interested in municipal law and our lower courts may achieve a greater sense of certainty as to how to proceed in a case where, as here, deannexation is contested and consent withheld.

First, the statute quoted *ante* is understandably silent as to what the content should be of any resolution expressing denial of consent. Demarest's resolution in this case, while not fatally defective, assuredly is not particularly informative as to the reasons for which the governing body concluded deannexation would be "contrary to the best interest of the Borough." It recites "findings of fact," many of which do not bear at all on the issues of social or economic detriment; rather, they set forth the many benefits flowing to Beechwood Farms' residents and are suggestive of their poor judgment in wanting to leave Demarest. It would be more appropriate if the recitations in such a resolution were confined to those facts supportive of the governing body's conclusion that social or economic detriment will result from deannexation.

Second, when the case reaches the trial stage, it is sufficient in the first instance for plaintiffs simply to introduce into evidence the petition by which they seek deannexation, together with evidence of the municipality's denial

of consent. While we have held that plaintiffs have the burden of proving the arbitrary and unreasonable quality of the governing body's action, we are sensitive to the problem they face in proving what is essentially a negative, *i. e.,* that deannexation will not result in social or economic harm. Therefore, the trial court here was correct in denying Demarest's motion for judgment at the end of plaintiffs' case, their proof of a petition and withholding of consent being sufficient to shift to the municipality the burden of coming forward with evidence to which it clearly had a superior means of access.

Third, we have considered the problem of what kind of evidence is relevant to the issue of "social detriment," at the same time acknowledging that "economic injury" is relatively easy to recognize and quantify. In undertaking briefly to address this problem we would stress the point that whatever factors are alluded to are in no way intended to be all-inclusive, for in the final analysis the governing body and the trial judge will have to bring to bear their own knowledge, experience and perceptions in determining what, in the context of deannexation, would inflict social injury upon the well-being of a community. With that cautionary note in mind we would suggest that social detriment might be found in a community's being deprived of the petitioner's participation in the religious, civic, cultural, charitable and intellectual activities of the municipality; their meaningful interaction with other members of the community and their contribution to its prestige and social standing; the part they play in general scheme of their municipality's social diversity; and, conceivably, the wholesome effect their presence has on racial integration. These are, of course, values which undergo change with the times and are accorded different weight depending in part on the composition of the community and its governing body. We repeat that in listing them, we are recognizing only some of the appropriate considerations.

Lastly, we take note of what plaintiffs contend is the legislative intention manifest in the annexation statute, *N. J. S. A.* 40:43–26. That act represents, it is argued, "a long history of legislative recognition that municipal boundaries are largely a matter of historical accident, and that more effective home rule can be achieved by adjusting the boundaries from time to time to conform with the community of interests of the residents of particular areas," citing *Stout v. Glen Ridge,* 59 *N. J. L.* 201, 204 (E. & A. 1896); *Miller v. Greenwalt,* 64 *N. J. L.* 197 (Sup. Ct. 1899), aff'd, 64 *N. J. L.* 722 (E. & A. 1900).

While the first of the quoted propositions may find some support in the cited cases, the second is afforded none. Nor do we perceive that the statute in question encourages the adjustment of municipal boundaries "from time to time" dependent upon the changing "community of interests" of the residents. We find in the statute an intention on the part of the Legislature to give precedence to a more significant policy, that of preservation of municipal boundaries and maintenance of their integrity against challenge prompted by short-term or even frivolous considerations such as "tax shopping" or avoidance of assessments. It is exactly for this reason that there must be secured the governing body's consent, which may be withheld in the reasonable exercise of its discretion. That safeguard stands in support of the intended policy of the legislature.

The order compelling the defendant council to adopt a resolution expressing consent to plaintiffs' petition is hereby vacated, and the judgment below is:

Reversed.

PASHMAN, J. (concurring and dissenting in part). I concur in the majority's conclusion, that those seeking to withdraw from a township must bear the burden of proof as to the reasonableness *vel non* of the parent municipality's denial of consent to deannexation.

It is not appropriate, however, to speak of the introduction into evidence of the petition for deannexation together with resolution of denial of consent as constituting a *prima facie* case sufficient to require the township to "come forward with proof" of specific economic and/or social harm that would result from deannexation. The result of deannexation must of necessity carry with it a concomitant loss of ratables, thereby occasioning, in the ordinary situation, economic injury to the township. Similarly, withdrawal will always disrupt, in varying degree, the social fabric of a community. It must always fall, therefore, to the potential secessionists to prove that in fact the economic or social consequences of deannexation will be *de minimis*.

Further, the majority overstates its claim that the fact of specific economic or social harm will suffice to bar deannexation; as above, all deannexation will produce that harm, and no deannexation could ever succeed were such injury the gauge of the propriety of the township's refusal of consent.

I would affirm the principle stated in *West Point Island,* that the reasonableness of municipal action is at issue in these cases. I do not believe that the plaintiffs should be confined, as the majority suggests, to an attempt to negative proof of economic and social injury, a task in which they can never succeed. Instead, the plaintiffs should prove that the extent of potential harm to the parent municipality is insignificant, or alternatively, that actual harm to the township is so far outweighed by the beneficent results to the secessionist sector, that refusal of consent was palpably unreasonable.

This burden on the plaintiffs is a heavy one. In the case *sub judice,* the economic injury to the parent township was obvious, and social injury was not a frivolous claim. Those seeking deannexation could not negative the proofs of actual injury; nor could they offer any compelling countervailing consideration, such as the alleviation of any existing oppressive condition resulting from their location in Demarest;

nor could they point to any significant relevance of factors which generally bear on deannexation, such as isolation, availability of services, symmetry, unity of interests, etc. See 62 *C. J. S. Municipal Corporations* § 48, *pp.* 141–145; 62 *A. L. R.* 1011, "Facts Warranting Extension or Reduction of Municipal Boundaries."

Accordingly, I concur in the judgment of reversal.

PASHMAN, J., concurs in result.

*For reversal* — Acting Chief Justice JACOBS, Justices HALL, SULLIVAN, PASHMAN and CLIFFORD and Judges CONFORD and COLLESTER—7.

*For affirmance*—None.