903 A.2d 527

D'ANASTASIO CORP., PLAINTIFF, v. THE TOWNSHIP OF PILESGROVE AND THE PLANNING BOARD OF THE TOWNSHIP OF PILESGROVE DEFENDANTS.

Superior Court of New Jersey
Law Division

Decided April 22, 2005.

Stuart A. Platt for plaintiff (Marrazzo & Platt, P.C.).

William L. Horner for defendants (Horner & Horner, L.L.C.).

STANGER, A.J.S.C.

This matter before the court arises from plaintiff's appeal of a decision by defendant Township of Pilesgrove (Pilesgrove) denying plaintiff's petition for deannexation of 36.27 acres of vacant, undeveloped farmland owned by the Gemberling Family Partnership and located in Pilesgrove Township. Plaintiff, D'Anastasio Corp., the contract purchaser/builder of the entire Gemberling property, is seeking to deannex the portion of the Gemberling property located in Pilesgrove and annex that portion to Woodstown for purposes of development. There are no reported vacant land annexation decisions.

N.J.S.A. 40A:7–12 permits land from one municipality to be annexed to contiguous land of another municipality. Pursuant to N.J.S.A. 40A:7–12, two-thirds of the full membership of the governing body of the municipality in which said land is located, here Pilesgrove, must consent to the annexation. N.J.S.A. 40A:7–12.1 provides the standard for judicial review when a petition is denied and provides as follows:

> In any judicial review of the refusal of the governing body of the municipality in which the land is located or the governing body of the municipality to which annexation is sought to consent to the annexation, the petitioners have the burden of establishing that the refusal to consent to the petition was arbitrary or unreasonable, that refusal to consent to the annexation is detrimental to the economic and social well-being of a majority of the residents of the affected land, and that the annexation will not cause a significant injury to the well-being of the municipality in which the land is located.

The statute clearly places on the petitioner the burden to establish the following: (1) that the refusal to consent to the petition was arbitrary or unreasonable, (2) that refusal to consent to the annexation is detrimental to the economic and social well-being of a majority of the residents of the affected land, and (3) that the annexation will not cause a significant injury to the well-being of the municipality in which the land is located. The

following discussion will address each of the preceding, conjunctive elements in turn.

### Pilesgrove's Refusal To Consent To Plaintiff's Annexation Petition Was Not Arbitrary Or Unreasonable.

Pursuant to *N.J.S.A.* 40A:7–12.1, the petitioner has the burden of establishing that the refusal to consent to the petition was arbitrary or unreasonable. "As a general matter, in reviewing decisions of local boards our courts recognize that such bodies have particular knowledge of local conditions and are therefore extended 'wide latitude in the exercise of their delegated discretion.'" *Avalon Manor Improvement Ass'n, Inc. v. Middle Twp.,* 370 *N.J.Super.* 73, 91, 850 *A.*2d 566 (App.Div.) (citing *Booth v. Board of Adj. of Rockaway Twp.,* 50 *N.J.* 302, 306, 234 *A.*2d 681 (1967)), *certif. denied,* 182 *N.J.* 143, 861 *A.*2d 847 (2004). There is a presumption of validity accorded to municipal actions. *Russell v. Stafford Twp.,* 261 *N.J.Super.* 43, 61, 617 *A.*2d 685 (Law Div.1992) (citing *Ward v. Montgomery Twp.,* 28 *N.J.* 529, 539, 147 *A.*2d 248 (1959), and *Quick Chek Food Stores v. Springfield Twp.,* 83 *N.J.* 438, 447, 416 *A.*2d 840 (1980)). "The law presumes that municipal governing bodies will act fairly, with proper motives and for valid reasons." *Ibid.* (citing *Kramer v. Sea Girt Bd. of Adj.,* 45 *N.J.* 268, 296, 212 *A.*2d 153 (1965)). This presumption "may only be overcome by a showing of arbitrariness or unreasonableness." *Ibid.* (citing *Dock Watch Hollow Quarry Pit v. Warren Twp.,* 142 *N.J.Super.* 103, 116, 361 *A.*2d 12 (App.Div.1976), *aff'd,* 74 *N.J.* 312, 377 *A.*2d 1201 (1977); *Hutton Park Gardens v. West Orange Town Council,* 68 *N.J.* 543, 564, 350 *A.*2d 1 (1975), and *Riggs v. Long Beach Twp.,* 109 *N.J.* 601, 611, 538 *A.*2d 808 (1988)); *Avalon Manor, supra,* 370 *N.J.Super.* at 90, 850 *A.*2d 566. "Arbitrary and capricious" means " 'willful and unreasoning action, without consideration and in disregard of circumstances.'" *Beattystown v. Department of Envtl. Prot.,* 313 *N.J.Super.* 236, 248, 712 *A.*2d 1170 (App.Div.1998) (quoting *Worthington v. Fauver,* 88 *N.J.* 183, 204–05, 440 *A.*2d 1128 (1982)). Application of these principles to the present matter warrants the conclusion that Pilesgrove did not

act arbitrarily or unreasonably in denying the deannexation petition.

Pilesgrove denied plaintiff's petition in reliance upon Christopher Warren's Economic and Social Impact Analysis. Preliminarily, Warren's report concluded that 27.5 acres were buildable and would support about twelve to thirteen residential building lots under existing zoning (plaintiff contends that seven to eight residential units could be constructed under existing zoning). If the property in question (PIQ) were rezoned, assuming water and sewer were made available, then the PIQ would support sixty single family detached units. Further, the report concluded that development of the PIQ was reasonable because of the limited size of the Borough of Woodstown and the attractiveness of the town. Given the preceding preliminary conclusions, the report went on to address both economic and social impacts of the deannexation on Pilesgrove.

Concerning economic impact, Warren's report discussed economic impacts if the subject parcel were developed under current zoning and a possible rezoning allowing for a higher density, similar to that proposed by plaintiff. Under current zoning, the economic impact would result in losses of $116,000 in annual tax revenues ($3.4 million over twenty years), a $20,000 to $40,000 development fee as a compensatory payment, a $12,000 recreation assessment fee, a $1,200 per year Farmland Trust Fund tax ($35,000 over twenty years), and $11,366 in rollback taxes. Under a rezoning, the economic impact would result in losses of $348,000 in annual tax revenues ($10 million over twenty years), a $120,000 development fee as a compensatory payment, a $3,600 per year Farmland Trust Fund tax ($106,000 over twenty years), and $11,366 in rollback taxes. Furthermore, the Warren report concluded that Pilesgrove is in need of ratables to defer school costs because Pilesgrove has about 65% of the total ratables of the shared school district with Woodstown, but is responsible for about 75% of the total school budget. Warren's final conclusion on economic impact is that deannexation will "have a significant economic impact."

Concerning social impact, Warren concluded that "the proposal does not have an impact on the social fabric of the Township in the sense that deannexation will not result in the loss of valuable members of the community." Furthermore, since many services and facilities are shared, the social impact is reduced. However, the report goes on to address the subjective impact on Pilesgrove's image and how the proposal is in direct conflict with the balanced community planning objective since Pilesgrove is deprived of the ability to control all of its potential growth areas.

Relying upon Warren's report and testimony, the Pilesgrove Planning Board recommended to the Township to refuse consent to the deannexation. The Planning Board memorialized its decision in Resolution No. 04–137, which sets forth most of the conclusions in the Warren Report. A thorough examination of the record before this court, given the legal principles enunciated in the beginning of this discussion, establishes adequate evidence to support the conclusion that defendants did not act arbitrarily or unreasonably, but rather, based their decision denying the petition in reliance upon the report prepared by and testimony of Pilesgrove's professional planner, Mr. Warren. Therefore, plaintiff cannot meet the first requirement pursuant to *N.J.S.A.* 40A:7–12.1 establishing that defendants in denying the petition acted arbitrarily or unreasonably.

**The Second Element Under *N.J.S.A.* 40A:7–12.1 Is Moot.**

Pursuant to *N.J.S.A.* 40A:7–12.1, the petitioner also has the burden of establishing that the refusal to consent to the annexation is detrimental to the economic and social well-being of a majority of the residents of the affected land. In *Russell,* the court interpreted the second element "to require the petitioners to show that deannexation will be beneficial to a majority of the residents of the land being deannexed." *Russell, supra,* 261 *N.J.Super.* at 49, 617 *A.*2d 685. The *Russell* court believed that the second element is incongruous since *N.J.S.A.* 40A:7–12 requires that 60% of the residents sign a document requesting annexation. *Ibid.* However, this interpretation of the second

element of *N.J.S.A.* 40A:7–12.1 softens the statutory requirement. Applying the *Russell* court's interpretation would seem to be incongruous because, as logic dictates, a resident would not sign the petition unless deriving some sort of benefit from the proposed annexation. However, the statute does not require the petitioner to show a benefit to the majority, but rather that the refusal to consent is detrimental to the economic and social well-being of the majority. This explicit statutory standard is congruous with *N.J.S.A.* 40A:7–12 because, although a resident would only sign if receiving a benefit, the refusal to consent, resulting in the denial of the sought-after benefit, may not rise to the level of "detrimental" to the economic and social well-being of the residents. For example, a resident may sign a petition for deannexation because the deannexation may result in less property tax. This is clearly an economic benefit to the residents. However, the refusal to consent may not be detrimental to the economic and social well-being of the residents. The residents may still be able to pay the higher property taxes, thus not evidencing detriment to the economic well-being of the residents.

Plaintiff in this matter cannot establish that the refusal to consent is detrimental to the residents of the land being deannexed because there are no residents on the PIQ. Neither the owner, nor the contract purchaser resides on the PIQ, nor do any other residents. Defendant contends that without residents, plaintiff cannot prove detriment to them. Further, defendant argues that the three elements of proof are conjunctive, not disjunctive; therefore, by failing to prove the second element, plaintiff has failed to meet its burden and denial of the petition should be affirmed. This reasoning is flawed because applying this analysis then under no circumstance could the owner of vacant land petition for deannexation. However, *N.J.S.A.* 40A:7–12 clearly permits an owner to petition for deannexation if the land is vacant. In enacting *N.J.S.A.* 40A:7–12.1, the Legislature is presumed to have been aware of the provisions of *N.J.S.A.* 40A:7–12. *Mahwah Twp. v. Bergen Cty. Bd. of Taxation,* 98 *N.J.* 268,

279, 486 *A*.2d 818 (1985); *Brewer v. Porch,* 53 *N.J.* 167, 174, 249 *A*.2d 388 (1969). Defendant's interpretation of the second element is in direct conflict with *N.J.S.A.* 40A:7–12, and would never allow for deannexation of vacant land. Therefore, the only reasonable interpretation of the second element, when the parcel to be deannexed is vacant, is that the second element becomes moot and the petitioner is absolved from its burden with respect to that element. Here, the land is vacant, and plaintiff is entitled to petition for deannexation of vacant land. Therefore, the second element under the analysis is moot.

Defendant also argues that if this court interprets the word "residents" in the statute broadly to include "absentee owners" and "contract purchasers of vacant land," the only detriment would be a potential loss of marketability or profits. Although this court agrees with defendant that, if so interpreted, the only detriment would be a loss of profitability, the statute is clear on its face that the detriment is that of residents, not owners, or contract purchasers.

For purposes of a thorough analysis, plaintiff argues in its initial brief that the second element is satisfied because of the fact that 100% of the property owners being affected have signed the petition.[1] This argument emphasizes the point raised earlier in this opinion that the *Russell* court improperly softened the burden associated with the second element of *N.J.S.A.* 40A:7–12.1. Applying the *Russell* interpretation changing the requirement from "detriment" to "benefit" renders the second element meaningless as evidenced by plaintiff's argument, because petitioners for deannexation can establish the second element of *N.J.S.A.* 40A:7–12.1 simply by showing that residents signed the petition. Had the *Russell* court applied the explicit terms of the second element, this result would have been avoided. Although signing a petition

---

[1] Plaintiff's first analysis in its initial brief does not argue that the second element under *N.J.S.A.* 40A:7–12.1 is moot, but was otherwise satisfied. Plaintiff first raised the issue of mootness in its Reply Brief.

evidences a sought after benefit and may suffice in applying *Russell,* such signatures do not amount to a detriment to the economic and social well-being of residents. Further, plaintiff contends that the second element is satisfied because the sole property owner of the PIQ will clearly benefit by the annexation in that it will be able to sell its lands, which will result in a much more unified, cohesive and environmentally sensitive development pattern given the wide residential zoning disparity between Woodstown and Pilesgrove. This position does not demonstrate any benefit accrued to the property owner, except that it will be able to sell its lands. However, there is no evidence of record suggesting that the PIQ would not sell if annexation was denied. Also, this court fails to recognize how the property owner, which resides in Florida, will benefit by selling its lands which will result in a much more unified, cohesive and environmentally sensitive development in New Jersey. The bottom line is that plaintiffs are seeking annexation of the PIQ to Woodstown because Woodstown's zoning would permit greater density on the PIQ, thus resulting in greater profits to plaintiff contract purchaser. This amounts to zoning shopping, which is prohibited by case law and which will be addressed below.

### Plaintiff Cannot Establish That The Annexation Will Not Cause A Significant Injury To The Well-being Of The Municipality In Which The Land Is Located.

The third element of *N.J.S.A.* 40A:7–12.1 places on the petitioner the burden of establishing that the annexation will not cause a significant injury to the well-being of the municipality in which the land is located. This element addresses the initial standard set out in the earlier cases involving annexation petitions, however, the Legislature with the enactment of *N.J.S.A.* 40A:7–12.1 changed the burden of proof now requiring petitioners to show that the annexation will not cause a significant injury to the well-being of the deannexing municipality. *Russell, supra,* 261 *N.J.Super.* at 49, 617 *A.*2d 685.

## Social Impact

■ Plaintiff contends that since the PIQ is vacant, there can be no social impact and that this position is conceded by the Township Planner, Mr. Warren. Warren never conceded that there would be no social impact. Actually, Warren's report discusses social impact and states that due to intermunicipal services and facilities, the "potential social impact of deannexation is reduced." Warren's report then discusses the impact on the community image and how Pilesgrove will be deprived of the "ability to control all of its potential growth areas." This analysis falls far short of a concession on behalf of Mr. Warren that there is no social impact.

## Economic Impact

■ Prior to the discussion on economic impact, there are two issues involving considerations by Pilesgrove that may be viewed as too remote or speculative. First, can a municipality consider the future loss of tax revenues? Second, can a municipality consider the loss of tax revenues under current zoning or rezoning permitting greater density if the PIQ were developed? In *Ryan v. Borough of Demarest*, 64 *N.J.* 593, 603, 319 *A.*2d 442 (1974), the Court stated that "the municipal fathers quite properly considered the amount of both the long[-]term and short[-]term loss of revenue in determining that the proposed deannexation would mean economic injury to the Borough." Likewise, in *Avalon Manor*, the court rejected an assertion that the future loss of tax revenues could not be considered in reviewing the petition and stated that "a fair analysis of the residents' and municipalities' well-being necessarily involves consideration of economic and social factors over time, and the prospect for and likelihood of change." *Avalon Manor, supra,* 370 *N.J.Super.* at 102, 850 *A.*2d 566. Clearly, under New Jersey case law, a municipality may consider lost, future tax revenues. In addition, a municipality may consider lost revenues under current zoning or rezoning if there is the prospect for and likelihood of change. It should be noted that

the court in *Avalon Manor* did not limit the number of future years a municipality could consider for lost revenues, but rather limited the period of time to determine ratables to "two or three years, or even several more, perhaps, under particular circumstances." *Ibid.* The court limited the ratables period to allow for an accurate assessment in case of fluctuations in the real estate market. This would establish the ratables to allow for a calculation of lost revenues over a period of time, but does not limit the number of future years a municipality may consider in determining future, lost revenues.

■ Plaintiff argues that the deannexation will not result "in any real or substantial economic injury" to Pilesgrove. Plaintiff's support for this position is that the PIQ is small and the tax revenues lost from the farm would be small. However, based on Warren's report that development of the PIQ was reasonable as discussed earlier and the law allowing Pilesgrove to consider future, lost revenues over time and the prospect for and likelihood of change concerning the PIQ, defendant properly considered the economic impact if the PIQ were developed under existing zoning or rezoning and the loss of revenues associated with such development. Such speculation over possible development and even a potential rezoning is particularly appropriate given that the subject parcel is vacant and located in an area ripe for future development. Also, plaintiff's concept plan of development, which speculates that the PIQ would be developed under greater density than currently permitted by Pilesgrove zoning, further evidences the fact that there is a prospect for and likelihood of a zoning change related to the development of the PIQ. Finally, there is simply no case law limiting the period of time into the future a municipality may consider as to lost tax revenues. This court finds that the twenty (20) year period utilized in Warren's report to assess economic injury is reasonable, applying the controlling case law and considering the loss of future property taxes in perpetuity.

Plaintiff also argues that any economic injury would be negated by plaintiff's offer of reparation. The reparations offered by plaintiff are incomplete. Plaintiff identified losses to Pilesgrove if the PIQ were developed under current zoning in the amount of $58,686. Plaintiff failed to include with the loss of fees and charges the loss of property tax revenues if developed under either current zoning or rezoning. Thus, the offer of reparation by plaintiff was incomplete. Further, a reparation in this matter "would not serve to offset the loss in perpetuity" of Pilesgrove ratables. *Id.*, at 98, 850 *A.*2d 566. Pilesgrove stands to lose not just $116,000 in tax revenues for one year under current zoning or $348,000 if rezoned, but a loss of $116,000 or $348,000 a year in perpetuity. Therefore, not only was the reparation incomplete in that it did not include the loss of tax revenue for one year, but it is also insufficient in that it does not include losses over a period of time. Based partly on the economic considerations as set forth in greater detail earlier in this analysis and for the reasons discussed above, Pilesgrove refused to consent to the deannexation.

A closer examination of *Avalon Manor* is helpful in assessing economic impact. In *Avalon Manor,* the court upheld a denial of a deannexation petition that proposed annexing 2.7% of Middle Township's lands. *Id.*, at 77, 850 *A.*2d 566. The deannexing municipality relied upon the following in concluding that there would be a significant negative impact: consequences to the schools, tax increases to the remaining residents, the ongoing losses of tax revenues and ratables, and what the Board termed as the "crux" of plaintiff's application, the " 'tax shopping' or avoidance of assessments." *Id.*, at 86, 850 *A.*2d 566. More particularly, the ratables loss was $32,029,700 out of $901,835,239, or 3.56% and the revenue loss was $640,000 per year (Ortman, an expert in *Avalon Manor,* "made clear that whatever the revenue loss from deannexation, that amount was not merely a one-time loss but would continue in subsequent years."). *Id.*, at 88, 850 *A.*2d 566. Here, Warren's report discussed the need for ratables to defer school costs. If the subject parcel were developed, the ratables loss would be $4,000,000 out of $240,000,000, or 1.7% under current

zoning and $12,000,000 out of $240,000,000, or 5% if rezoned. Further, the report similarly discusses how the loss of revenue will not be a one-time loss but would continue in subsequent years resulting in a loss of $3.4 million over twenty years under current zoning or $10 million over twenty years if rezoned. The report also discusses additional considerations such as the development fee, the Recreation Trust Fund assessment, the Farmland Trust Fund tax, and rollback taxes. There is equal justification in the record before this court as there was in *Avalon Manor*, supporting the conclusion that annexation would cause a significant injury to the well-being of Pilesgrove and, furthermore, that Pilesgrove did not act arbitrarily or unreasonably in refusing to consent to the deannexation petition.

### Plaintiff's Petition For Annexation Amounts To Zoning/Density Shopping And Is Prohibited By Case Law.

In *Ryan*, the court stated the following:

> We find in the statute an intention on the part of the Legislature to give precedence to a more significant policy, that of preservation of municipal boundaries and maintenance of their integrity against challenge prompted by short-term or even frivolous considerations such as 'tax shopping' or avoidance of assessments. *Ryan, supra*, 64 *N.J.* at 606, 319 *A.*2d 442.

Although the *Ryan* opinion was delivered before the enactment of *N.J.S.A.* 40A:7–12.1, this "policy is still evident today." *Russell, supra*, 261 *N.J.Super.* at 58, 617 *A.*2d 685; see also *Avalon Manor, supra*, 370 *N.J.Super.* at 96–97, 850 *A.*2d 566.

■ Here, what plaintiff is trying to accomplish through deannexation amounts to zoning shopping, density shopping, and/or an avoidance of zoning or density. Interestingly, not one case submitted by counsel addressing annexation involved a petition submitted by a speculator builder, but rather residents of the lands sought to be deannexed for reasons affecting those residents. This is important because the only benefit that plaintiff will receive via annexation of the PIQ to Woodstown from Pilesgrove is more favorable zoning requirements, and thus, greater density resulting in more building lots and increased profits.

Plaintiff does not benefit because the community may result in a more unified, cohesive, and environmentally sensitive development. If this court were to accept plaintiff's position, this court would create a slippery slope whereby developers could purchase vacant lands suitable for development and bordering municipal boundaries then seek annexation into the neighboring municipality if the annexing municipality provides for greater density leading to greater profits for the developer. This is not the result contemplated by the Legislature as discussed in *Ryan* of preservation of municipal boundaries and maintenance of integrity against frivolous challenges. Also, there is nothing preventing plaintiff from developing the Gemberling property as proposed in its concept plan, except plaintiff does not want to expend the additional time and resources to pursue intermunicipal agreements and zoning variances or revisions to Pilesgrove's Master Plan. Furthermore, during oral argument, plaintiff was asked if annexation would have been sought if the zoning in Pilesgrove were identical to that of Woodstown. Plaintiff responded that annexation would still be sought because annexation would allow plaintiff to avoid the additional burden and cost of submitting two applications to two different municipalities for approval of one development. Such a position does not support a precedent of preservation of municipal boundaries and maintenance of their integrity against challenge prompted by short-term or even frivolous considerations. To the contrary, such reasoning is precisely the type of frivolous consideration envisioned by the *Ryan* court. In conclusion, for the reasons discussed above, the defendant's refusal to consent to the petition for deannexation is sustained. Plaintiff's complaint is dismissed.

Dismissed.