NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3048-19

SEAVIEW HARBOR
REALIGNMENT
COMMITTEE, LLC,
JOHN DABEK, DIAN DABEK,
EDWARD MCGLINCHEY,
VIRGINIA MCGLINCHEY,
JOSEPH STEWART, and
PAMELA STEWART,

      Plaintiffs-Appellants/
Cross-Respondents,

v.

TOWNSHIP COMMITTEE OF
EGG HARBOR TOWNSHIP, and
EGG HARBOR TOWNSHIP,

      Defendants-Respondents/
Cross-Appellants.

_____

> **APPROVED FOR PUBLICATION**
>
> **December 29, 2021**
>
> **APPELLATE DIVISION**

Argued November 1, 2021 – Decided December 29, 2021

Before Judges Sabatino, Rothstadt and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L-0079-17.

John Paul Doyle argued the cause for appellants/cross-respondents (Carluccio, Leone, Dimon, Doyle & Sacks, LLC, attorneys; John Paul Doyle, of counsel and on the briefs; Marguerite Kneisser, on the briefs).

Marc Friedman argued the cause for respondents/cross-appellants (Marc Friedman and Barker, Gelfand, James & Sarvas, attorneys; Marc Friedman and Jeffrey P. Sarvas, on the briefs).

The opinion of the court was delivered by

NATALI, J.A.D.

Plaintiffs, Seaview Harbor Realignment Committee, LLC, and certain residents of Seaview Harbor (Seaview), a section of Egg Harbor Township, filed a petition for deannexation under N.J.S.A. 40A:7-12 with the Township Committee, seeking to annex their small community to the neighboring Borough of Longport. After the Committee referred plaintiffs' petition to the Planning Board, the Board held over thirty days of hearings to assess whether the social and economic harm that Seaview would sustain if deannexation was denied outweighed the harm that would visit Egg Harbor if the petition was granted.

The Board completed an impact report and recommended the Committee reject Seaview's petition. The Committee reviewed the impact report and adopted a resolution accepting the Board's recommendations based primarily on the harm that deannexation would cause Egg Harbor residents. It also adopted a separate resolution determining that plaintiffs failed to comply with N.J.S.A. 40A:7-12's jurisdictional requirement as they failed to clearly delineate the land

subject to deannexation and establish that Longport and Seaview were contiguous.

Plaintiffs filed a four-count complaint in lieu of prerogative writs challenging the Committee's determinations. Count one sought a determination that the Committee's refusal to consent to deannexation was arbitrary and unreasonable; count two sought a determination that plaintiffs' petition and accompanying map were proper and complete and to set aside the resolution declaring otherwise; count three alleged a violation of the New Jersey Open Public Meetings Act, N.J.S.A. 10:4-6 to -21, and Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13; and count four asserted a violation of the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 to -2. Judge Julio Mendez bifurcated count four and assigned it a separate docket number.

The parties thereafter cross-moved for partial summary judgment. Judge Mendez issued a March 8, 2019 order and written opinion granting plaintiffs summary judgment on count two, concluding that their petition complied with the requirements of N.J.S.A. 40A:7-12 and they established Seaview is contiguous with Longport under that statute, and count three, finding that defendants had violated OPRA. Before us, defendants do not challenge the judge's ruling on count three or his decision to bifurcate count four.

Judge Mendez held a two-day final hearing regarding count one and, on February 18, 2020, issued an order denying relief to plaintiffs. In his accompanying written opinion, Judge Mendez applied the three-part test enumerated in N.J.S.A. 40A:7-12.1,[1] finding that, although plaintiffs established that the Committee's refusal to consent to deannexation was detrimental to a majority of Seaview residents, that denial was neither arbitrary nor unreasonable, and plaintiffs failed to establish that deannexation would not cause significant harm to the well-being of Egg Harbor.

On appeal, plaintiffs challenge the court's order, primarily contending that the judge erred when he concluded that Egg Harbor's residents would suffer significant harm if deannexation was approved and that this harm outweighed the injury Seaview residents would suffer by being a part of Egg Harbor.

---

[1] N.J.S.A. 40:7-12.1 provides:

> In any judicial review of the refusal of the governing body of the municipality in which the land is located . . . to consent to the annexation, the petitioners have the burden of establishing that [1] the refusal to consent to the petition was arbitrary or unreasonable, [2] that refusal to consent to the annexation is detrimental to the economic and social well-being of a majority of the residents of the affected land, and [3] that the annexation will not cause a significant injury to the well-being of the municipality in which the land is located.

A-3048-19

Plaintiffs also raise a bias challenge, claiming that members of the Committee and Board, specifically Mayor James McCullough, Township Administrator Peter Miller, and Committee member Frank Finnerty, all of whom recused themselves, had predetermined that they would oppose the petition and influenced other members to do the same, rendering the final decision arbitrary, capricious, and unreasonable. Defendants cross-appeal, challenging the court's finding that plaintiffs established Egg Harbor's refusal to consent to deannexation would be detrimental to a majority of Seaview residents, and that plaintiffs met the jurisdictional requirement of adequately identifying the land subject to deannexation and establishing that it was contiguous with Longport.

We reject plaintiffs' arguments and affirm substantially for the reasons expressed in Judge Mendez's written opinion but write separately to amplify the bases for our decision in light of the significant issues raised by the parties and to emphasize that a petition under N.J.S.A. 40:7-12.1 may be appropriately denied where a court concludes that a municipality's decision was neither arbitrary nor unreasonable and that it would be detrimental to the majority of residents despite the undisputed fact that deannexation would produce considerable property tax savings for the petitioning homeowners, who seek to become part of a lower tax municipality. That detriment can include the loss of significant services to the community at large, removal of a diverse citizenship,

A-3048-19

and likely erosion of valuable civic participation caused by the absence of those homeowners who seek to deannex from the community.

Based on our decision, we do not address the merits of defendants' cross-appeal as those arguments fundamentally challenge the court's findings and not its judgment, in which defendants were successful before the court. See Price v. Hudson Heights Dev. LLC, 417 N.J. Super. 462, 463 (App. Div. 2011).

## I.

We detail below salient parts of the record developed before the Board and which are relevant to our decision. Egg Harbor is a municipality of approximately 43,000 residents. It is comprised of a seventy-five square-mile area of primarily residential mainland communities in the southeast section of Atlantic County. The eastern section of the Township contains a marsh with various water channels.

Seaview is located at the southeast portion of the marsh, next to a waterway that runs between Seaview and Longport. The Seaview section is approximately 70.9 acres in size and 4.3 miles east of the mainland portion of the Township, separated by marshland and multiple municipalities. It comprises approximately 1% of Egg Harbor's total land area and has a population of 102 residents with ninety-two residential homes, two vacant lots approved for residential use, a utility lot, a marina with 300 boat slips, a restaurant, and a

beach with no public access. The homes are relatively new, having first been developed in the early 1960s. The marina was constructed later and opened in 1987.

Because a marsh separates Seaview from Egg Harbor, Seaview residents claimed that they rarely travel to the mainland and did not feel that they were a part of that community. Instead, they relied primarily on Longport, connected to Seaview by way of the Route 152 bridge, for most of their activities and services as the drive to Longport is much shorter than the drive to the Township mainland, especially in traffic.

In support of their claim that continued association with Egg Harbor was, and will be, detrimental to their social and economic well-being, plaintiffs stated they identified with Longport residents, and explained the many activities in which they participate in that municipality, such as shopping, dining, sports, and religious services. Further, while Seaview had only a handful of school age children, plaintiffs also testified that none attended Egg Harbor public schools, as the drive took over an hour and the children had few friends in Egg Harbor because, as noted, most residents socialized and participated in activities in Longport.

Consistent with their identification as Longport residents, plaintiffs stated many of their homes had Longport addresses and zip codes, which often resulted

7

in confusion as to their location and status as Egg Harbor residents. Resulting delays in mail delivery occurred, and residential discounts and benefits through Egg Harbor were occasionally not applied. Plaintiffs also felt that Egg Harbor was not concerned with their well-being.

Further, plaintiffs considered Egg Harbor's emergency services to be inadequate, untimely, and a reflection of the municipality's disregard for their needs. They complained that Egg Harbor police and firemen did not always know where their homes were located, and took too long to respond to calls for help. Most times, Longport provided them the emergency services they needed. They also claimed that the fire department had an insufficient water supply within Seaview and that Egg Harbor had resisted efforts to improve that critical need.

Plaintiffs also claimed that snow removal was rarely done in a timely manner, which resulted in private residents plowing the roads, and that trash was picked up only once a week. They presented evidence that in neighboring shore towns like Ocean City, Longport, and Margate, trash pickup occurred biweekly, at least in the summer months.

Plaintiffs further maintained that Egg Harbor resisted efforts to beautify and maintain Seaview's common areas and had only recently agreed to cut the grass in its public spaces. They believed Egg Harbor's response to remedy the

A-3048-19

8

effects of Superstorm Sandy was inadequate and contended the municipality should assist residents with dredging efforts and bulkhead maintenance. Plaintiffs also claimed that Seaview was improperly zoned similar to the mainland section of Egg Harbor where lots were typically larger resulting in Seaview residents having to request variances for construction projects.

In addition, plaintiffs expressed disagreement with Egg Harbor's alleged failure to participate in flood insurance programs, resulting in their payment of higher premiums with less benefits. They claimed their premiums would be reduced if they were part of Longport as Longport was located in a flood zone and participated in the types of insurance programs that benefited similarly situated homeowners.

Finally, plaintiffs maintained they would pay significantly less in property taxes if they were Longport residents. Pursuant to a 2013 reassessment, Egg Harbor's tax rate was 2.376% while Longport's tax rate was only .388%.

On that point, plaintiffs' accountant Stephen Ryan testified that the average yearly property tax a Seaview resident paid to Egg Harbor was $20,759, based on an average assessed home value of $873,000. By comparison, the average yearly tax Seaview residents would pay to Longport was $3,347, for a savings of $17,412. The primary reason for the difference was the amount

A-3048-19

attributed to school expenditures and associated taxes as Longport had fewer children and therefore required less money to satisfy its educational obligations.

In 2014, Egg Harbor's total revenue was $37,452,455, 56% of which was derived from property taxes and 44% from various sources including municipal fees, state aid, state grants, interlocal service agreements, municipal court fees, ambulance fees, delinquent taxes, and construction fees. Seaview homeowners paid $1,839,847 in school taxes and $507,404 in municipal taxes for a total of $2,347,251.

Ryan explained that if Egg Harbor lost this revenue through deannexation, it could recoup the loss by raising remaining Egg Harbor residents' taxes a small amount, noting that Seaview residents contributed only 1% to the municipality's total revenue. According to Ryan, Egg Harbor could increase yearly property taxes on mainland residents by only $120.70 (a $27.05 municipal tax increase plus a $93.64 school tax increase), which would be less than the $176.61 average yearly tax increase Egg Harbor imposed in recent years.

Ryan also stated that he believed Egg Harbor could easily recoup this small loss in revenue from other sources. He said that it "has shown through ingenuity and resourcefulness the ability to generate new revenues, given their local service agreements" such as ambulance fees, which produced $1.2 million. Seaview, however, was unlikely to produce additional revenue for Egg Harbor

A-3048-19

because it was nearly all developed. Although slight revenue increases could be realized if homes were expanded, in reality few opportunities for development existed.

With respect to bonding, Ryan explained that a municipality may not bond more than 3.5% of its equalized valuation based on a three-year average. Using an equalization value as of 2012, Ryan concluded that Egg Harbor could borrow $152,567,632, and that the municipality's bonding capability would not be significantly affected by deannexation. Similarly, the school had a sufficient amount of funds available to borrow, so its bonding ability would also not be significantly affected.

Plaintiffs also produced a report from professional planner Tiffany A. Cuviello who concluded that deannexation would not harm Egg Harbor in any significant way and it made sense to do so based on location, identity, and the similarities between Seaview and Longport. She noted that the Seaview and Longport were both small residential shore towns with a significant population of seasonal-use homeowners. By contrast, 93% of the Egg Harbor population were permanent residents compared with only 47% in Seaview and 28% in Longport. Cuviello also noted that because Seaview had no public beaches, Egg Harbor residents would not be denied any benefit by granting deannexation.

Seaview residents, however, were denied a voice in Longport, where they went for most activities and services.

Cuviello added that as to municipal growth, Egg Harbor was designated a Regional Growth Area within the Pinelands under N.J.A.C. 7:50-5.13, and this designation would continue the "significant growth" Egg Harbor had seen in the past twenty years. According to the municipality's 2008 plan, its focus was on management of the 23% of land available for development. Seaview by contrast, was fully developed and would not contribute to growth and was not even recognized or included in Egg Harbor's short- or long-term growth plans.

Egg Harbor strenuously objected to Seaview's petition. Peter Miller, who served as Township Administrator for the preceding twenty-five years, stated that plaintiffs were simply attempting to avoid the higher property taxes imposed by the 2013 reassessment. He explained that the majority of their complaints regarding services were either unsupported or contradicted by Egg Harbor records, and their choice for social activities and schools would remain their choice regardless of whether they were annexed to Egg Harbor or Longport.

For example, with respect to plaintiffs' claims that they felt disassociated with Egg Harbor and it did not consider their needs, Miller testified that in the preceding thirty years, Seaview residents had been more actively involved in Egg Harbor planning and government than any other group. Since the 1980s,

A-3048-19

12

twelve Seaview residents served on the Egg Harbor Committee, Planning Board, Zoning Board of Adjustment, Economic Development Commission, Township Golf Corporation, Municipal Utilities Authority, and Environmental Commission, and as Miller testified, Egg Harbor "would be an entirely different community" if the Seaview residents had not "exert[ed] the influence and participation" in the development and planning.

With respect to plaintiffs' complaints that they had difficulty receiving mail and packages because people were confused by their addresses, Miller produced a letter from the postal service which stated that mail delivery was determined by zip code, not town name. As long as the zip code was correct, he asserted mail was delivered without issue.

As to plaintiff's complaints regarding the landscaping of common areas, Miller said Egg Harbor did not provide that service to any community within the municipality. With respect to municipal setbacks and zoning, Miller stated the Seaview developer had initially determined the setbacks and included them in the deeds. In 2000, a reexamination report proposed by Egg Harbor recommended decreasing setbacks for Seaview because the lots were smaller, and variances were needed too frequently. That recommendation was adopted, and since 2000, no Seaview resident has requested a variance.

A-3048-19

13

Miller also disputed plaintiffs' complaints that Egg Harbor did not timely respond to requests for aid after Superstorm Sandy and stated that Egg Harbor had repaired damaged Township property without delay. He explained that plaintiffs' complaints were more properly directed to the state, as it was primarily responsible for recovery efforts.

Miller also testified that, contrary to plaintiffs' claims, Egg Harbor participated in flood insurance programs for the past forty years. He explained that roughly ten years earlier, Egg Harbor considered participating in a program called the Community Rating System (CRS) and decided against it because it would have cost $15,000 and saved only four hundred owners $10,000 total. That program has since changed and was now affordable, and as of 2013, Egg Harbor was in the process of obtaining the requisite certifications for the CRS program, and prior to Superstorm Sandy, Egg Harbor began the process of participating in an additional flood insurance program.

In response to plaintiffs' complaints regarding maintenance of roads and common areas, Alan Simerson, Department of Public Works Director, testified that Seaview streets were swept at least twice a year and common lawn areas were regularly mowed. Further, if a storm resulted in debris, Egg Harbor provided additional clean up and sweeping and it also removed debris and litter on the shore.

A-3048-19

Further, after Superstorm Sandy, Egg Harbor began cleanup the day after the storm and continued the cleanup seven days a week, sixteen hours a day for two weeks with cleanup efforts continuing six days a week until they were no longer needed. Egg Harbor also placed a dumpster in Seaview for residents to dispose of materials themselves.

With respect to snowstorms, Simerson said Egg Harbor experienced nineteen events between 2009 and 2015, and Seaview received plowing services twenty-five times during that time. He stated that no residents of Seaview requested emergency plowing services during two blizzards occurring in that timeframe.

In recent years, Simerson said Egg Harbor also completed the following repair and improvement projects for the costs noted: repair and replacement of a drainage pipe in 2004 ($10,000); removal and replacement of center islands, concrete, and curbing in 2006 ($19,000); drainage replacement in 2007 that included the replacement of a faulty pipe at the end of a street ($62,536); replacement in 2012 of traprock that had eroded at the end of a street ($1,500); and repair of erosion caused by Superstorm Sandy in 2013 ($33,465). Finally, Simerson stated if Seaview seceded from Egg Harbor, Township residents would suffer harm because his department would have to decrease its staff due to a loss of tax revenue, which would result in loss of services.

Raymond Davis, Egg Harbor's Chief of Police, testified that while there was no formal agreement with nearby police departments, adjoining municipalities agreed that the department most able to respond to a call in the quickest manner would do so. This would not change if Egg Harbor consented to deannexation. He said that between January 1, 2011 and July 1, 2015, thirteen "priority calls" for police were made by Seaview residents, and the average response time was 11.74 minutes.

Chief Davis testified that if Seaview were not part of Egg Harbor, there would be a 17% overall loss in tax revenue, which would result in a loss of at least $175,000 to $200,000 per year for the police department. If the budget were reduced by that amount, Chief Davis stated the department would be forced to decrease the number of officers and community policing programs, which would harm Egg Harbor residents.

Robert Winkler, III, Chief of the Fire Department, testified that the fire department also had an informal agreement with neighboring departments to provide the fastest response to calls for help, regardless of location. He believed service would be impacted if Egg Harbor lost the tax funds that Seaview provided as the department was comprised of volunteers with a limited budget that would be affected by any cuts.

A-3048-19

Donald Stauffer, Egg Harbor's Fire Subcode Official, explained that while the water system in Seaview was not sufficient to fight a serious fire, Egg Harbor had plans in place to address any serious incident. In cases where additional water was needed, other fire companies would respond to provide additional water and a fire boat could pump a thousand gallons of water per minute from the ocean.

In response to Ryan's testimony that the school would not suffer from revenue lost due to deannexation, Kateryna Bechtel, School Administrator for Egg Harbor, disagreed and testified that cuts would have to be made if Egg Harbor did not have revenue from Seaview. To comply with the minimum state standard of funds per student, the school district needed $52,339,929. Currently, the budget, including debt service, was $132 million. Without debt service, it was "over $72 million," or roughly $20 million more than the state minimum, because it included programs that the state did not require, an example of which was tuition to send students to the Atlantic County Institute of Technology. The State froze school aid, and this added to the problem of having to rely on property taxes to fund the school's needs.

Bechtel said that if deannexation were granted, the school would lose approximately $1.88 million in funding from Seaview. Pursuant to the 2% tax levy required by state law, the school could not increase taxes more than 2% a

A-3048-19

year, excluding increases to pay health benefits for employees and debt service. In the last year, the school tax increase was 2.77%, the majority of which was attributed to employee health benefits expenses. Thus, it did not have the ability to increase taxes to compensate for the losses.

She also stated that if she were required to issue recommendations to reduce the budget, she would propose the following cuts: afterschool bus transportation; freshman sports programs; middle school sports and afterschool clubs; five-run bus drivers in order to maintain only four-run drivers to avoid providing them benefits; full-time paraprofessionals to be replaced with part-time paraprofessionals; the number of guidance counselors in high and middle schools; gifted and talented programs up to third grade; middle school honors math and science programs; attendance officers; and the Latin program. Together, those reductions would total approximately $1.88 million.

Further, Bechtel explained that if the school lost $1.88 million in funds, it would decrease the school's debt margin by 3.5%, or $3.5 million, which would reduce the school's ability to borrow money by $3.5 million. With respect to savings if deannexation occurred, Bechtel said Egg Harbor would "save some money in transportation costs," but the saving was insignificant. On this point she stated there were five students in Seaview, and the statutory amount for transportation was $884 per student. Thus, Egg Harbor would save only $4,420.

A-3048-19

18

As to future expenditures that would be affected by Seaview's deannexation petition, Bechtel said that the School Board was considering construction projects to improve the school as well a change from half- to full-day kindergarten, both of which would require additional funding. Egg Harbor may also have to provide affordable housing, which would increase the student population and require more classrooms and resources.

Dr. Richard Perniciaro, Executive Vice President for Planning Research at Atlantic Cape Community College, provided information as to the economic impact of deannexation. He explained that like investments, it is advantageous for a municipality to maintain diversity in a tax base to "hedge[] against good times and bad times." Seaview was "significantly wealthier" than other parts of Egg Harbor and provided a high tax base not otherwise available in Egg Harbor. It also provided diversity in property as it was the only waterfront location within Egg Harbor. Unlike parts of the mainland where values were subject to fluctuation, Seaview was likely to increase in value and therefore concluded Egg Harbor would suffer economically if it lost Seaview.

Township Financial Auditor Leon Costello agreed with Dr. Perniciaro. He testified that in 2012, the total assessed value of all homes in Seaview was $28 million, and that figure increased to $80 million after the 2013 reassessment. In 2015, Seaview homeowners paid $1,819,951.52 in school taxes and

A-3048-19

$505,542.09 in municipal taxes. Thus, if deannexation occurred, Egg Harbor would lose $2,325,493.61 in tax revenue. In terms of percentages, if Egg Harbor recouped the loss by increasing mainland homeowners' taxes, those residents would see a 4.6 cents increase per $100 of assessed value for school taxes and a 1.3 cents increase per $100 for municipal taxes, for a total increase of 5.9 cents per $100 of assessed value. For the average mainland home with an assessed value of $208,100, the yearly tax would increase by $122.78.

Costello did not believe that the loss could be addressed without raising taxes. He ruled out relying on the emergency fund, explaining that in 2013, the fund totaled only $535,000. That amount was "extremely low" in comparison to other towns, and reducing it would affect Egg Harbor's bonding rates. Egg Harbor's rating was currently four steps lower than the highest rating, which he said was not particularly good, and if the amount decreased, so would Egg Harbor's rating.

On January 29, 2016, Stuart Wiser, a Professional Planner with Remington, Vernick & Walberg retained by the Board, issued an extensive report summarizing the evidence presented at the Planning Board hearings and discussing the impact deannexation would have on Egg Harbor. Wiser noted that while plaintiffs claimed that they identified with Longport and did not participate in activities in Egg Harbor Township, no evidence established that

A-3048-19

plaintiffs had been deprived the opportunity to participate in Township activities, services, or governmental decisions, and their complaints regarding insufficient and untimely services and emergency responses were largely countered by records or otherwise unsupported.

Further, Wiser concluded no significant change would occur if Seaview were part of Longport because of the mutual aid agreements. Deannexation would also have no significant effect on zoning and variances because Longport's zoning was similar to the zoning in Seaview. Moreover, no evidence was presented establishing that plaintiffs had been denied variances or had been deprived the ability to build on their property. As to plaintiffs' complaints that Egg Harbor did not aid residents in dredging efforts, Wiser wrote: "the expectation that a municipality will commit significant taxpayer funds to improve waterfront property is misguided at best," and was not the typical practice of municipalities.

With respect to plaintiffs' alleged economic detriment caused by paying higher flood insurance premiums based upon their residing in Egg Harbor, Wiser reported that Egg Harbor participated in flood insurance programs that provided residents a 25% discount. Plaintiffs' claim that their taxes would be less if they were part of Longport was correct; however, Wiser noted that taxes were subject to change, and deannexation would result in a significant loss of taxes to Egg

21

A-3048-19

Harbor. He believed the loss would require an increase in taxes to mainland residents or a loss of services, both of which would cause "significant injury" to Egg Harbor.

The Board concluded that plaintiffs failed to satisfy their burden to prove that denying deannexation would be detrimental to Seaview residents and that deannexation would not cause significant harm to Egg Harbor. It found that "a balancing of the positive and negative impacts of deannexation weigh[ed] heavily in favor" of denying consent. It also determined that plaintiffs' complaints regarding services and zoning were not supported by evidence, and plaintiffs' choice of school and social activities were private decisions that would likely not be impacted by deannexation. Further, the Board explained that confusion as to the location of homes due to town designations occurred in other parts of the state as well and was not a basis to grant deannexation.

The Board conceded that plaintiffs would receive a benefit by paying less taxes to Longport and would likely pay less in flood insurance premiums. Deannexation, however, would deprive Egg Harbor of "the significant civic participation" that Harbor residents had provided. Egg Harbor would lose "one of its most unique upscale and affluent communities," which would "result in a diminishment of a source of pride and prestige to the remainder of the Township including the loss of social and economic diversity."

A-3048-19

22

Further, Egg Harbor would lose 2.4% of its tax ratables, which translated to $505,542.09 in municipal taxes and $1,819,951.52 in school taxes. To compensate for that loss, mainland residents would either experience a reduction in services, including school programs, or pay an additional 5.9 cents per $100 of assessed value. In return, Egg Harbor would receive only "a de minimis" reduction in services that it would no longer provide to Seaview. Egg Harbor agreed with the Board's conclusions and denied consent.

As noted, after a two-day final hearing, Judge Mendez applied the three-part test in N.J.S.A. 40A:7-12.1 and concluded that plaintiffs established that Egg Harbor's refusal to consent to annexation was detrimental to a majority of Seaview residents. He also determined, however, that plaintiffs failed to establish that the refusal was arbitrary or unreasonable, or that annexation would not cause significant injury to the well-being of Egg Harbor.

With respect to economic detriment to plaintiffs, Judge Mendez noted that the Planning Board had recognized the tax and insurance benefits Seaview residents would enjoy if they were part of Longport. Under Longport's tax rate, the average Seaview homeowner would save $17,412 a year in property taxes. Seaview residents would also likely pay less in flood insurance premiums because unlike Longport, Egg Harbor had not participated in the CRS until recently in 2017. The judge also found "some merit," however, in Egg Harbor's

A-3048-19

claim that plaintiffs were simply tax shopping since they filed their petition after the 2013 tax assessment, which had resulted in a "significant tax increase" for them.

In support of his decision, Judge Mendez discussed two opinions that addressed successful challenges to denials of deannexation petitions: West Point Island Civic Association v. Township Committee of the Township of Dover, 54 N.J. 339, 342 (1969) (West Point Island), involving West Point Island's petition for deannexation from Dover Township, and an unpublished decision, Bay Beach Way Realignment Committee, L.L.C. v. Township Council of Township of Toms River, No. OCN-L-2198-07PW (Law Div. July 22, 2008), aff'd, No. A-5733-07T1 (App. Div. July 9, 2009) (Bay Beach Way),[2] involving a similar petition filed by Bay Beach Way seeking deannexation from Toms River.

Judge Mendes concluded that the West Point Island and Bay Beach Way cases supported plaintiffs' claim of social detriment based on geographical and demographic similarities of Seaview and Longport. He explained that like Bay Beach Way and West Point Island, Seaview is a small, fully developed beach

---

[2] We cite to this unpublished opinion not as precedential authority but to explain Judge Mendez's reasoning, acknowledging the proscriptions detailed in Rule 1:36-3.

A-3048-19

town whose residents do not identify with mainland residents, but rather with a neighboring shore community, which is the source of nearly all their social activities and services, and which matches their demographics. However, he emphasized that unlike the mainland municipalities in West Point Island and Bay Beach Way, the evidence in this case supported Egg Harbor's conclusion that deannexation would be significantly detrimental to the majority of its residents.

As to social detriment, based on plaintiffs' allegations of insufficient emergency services, Judge Mendez found that it weighed in plaintiffs' favor, though not heavily. The geographic location of Seaview resulted in Longport's providing emergency services to Seaview as first responders, which resulted in social injury to plaintiffs who were denied annexation to Longport. However, the judge emphasized that no evidence established that any Seaview resident was denied emergency services when needed.

Judge Mendez rejected plaintiffs' claim that social detriment was also established by the distance residents had to travel into the mainland for municipal services. While that distance was inconvenient, it did not rise to the level of a detriment, particularly since residents infrequently had to visit municipal buildings, and voting by mail was an option.

The judge found that plaintiffs' claim of social harm based on community life, including use of schools, was in equipoise. He explained that while plaintiffs conducted nearly all their activities in Longport and did not send their children to Egg Harbor schools, Seaview residents had been actively involved in Township government and civic groups, which Egg Harbor would lose if deannexation occurred.

Judge Mendez found that plaintiffs had failed to meet their burden of showing that deannexation would not cause significant injury to the well-being of Egg Harbor residents. He found significant the lost tax revenue of $2,325,000 (based on $91 million in ratables), even though it comprised only 1.3% of Egg Harbor's budget and Egg Harbor had 22.7% of total land (fourteen square miles) available for future growth. Egg Harbor residents would endure a 5.9 cents per $100 increase to compensate for the loss, which translated to a yearly increase of $122.78 for the average homeowner. Egg Harbor had concluded that its residents could not endure the loss in tax revenue and had emphasized that the municipal budget could not be increased above two percent, and Egg Harbor was "in a state of economic stress as a result of state mandates," the state's failure to adequately fund programs, "the economic recession, reductions in property values and the casino crisis in Atlantic City."

The judge recognized that a $122.78 increase in taxes was much less than the difference in taxes Seaview residents would enjoy if annexed to Longport (i.e., they would pay $17,992 less, on average), but found that the loss of revenue to Egg Harbor year after year "would be a monumental loss" that would also negatively impact Egg Harbor's bond rating.

Further, the loss could result in a reduction of police services—primarily community-based services—as well as reductions in the fire department's ability to maintain equipment and facilities and purchase new equipment. Because the municipalities had a mutual aid agreement, Township emergency personnel would continue to respond to calls for help, and no quantifiable savings would be enjoyed by Egg Harbor in this respect. "[S]ignificantly add[ing] to the injury" was the effect the lost revenue would have on the schools. Programs, staffing, and quality of education would suffer, while the school would reap a benefit of only $4,420 for transportation reimbursements currently paid to Seaview residents who use other schools.

Additionally, deannexation would deprive Egg Harbor of the civic and government participation of Seaview residents and result in the loss of "the Township's most unique affluent and upscale communities which affects the Township's prestige, social standing and diversity."

A-3048-19

Judge Mendez concluded that "there [was] more than sufficient evidence to support the findings" of Egg Harbor on the detriment to its residents if deannexation occurred. He noted that the municipality was "best equipped to evaluate local impact and be acutely sensitive to the needs of [its] residents."

The judge also rejected plaintiffs' bias-based claims, finding that plaintiffs had received a fair hearing and that Egg Harbor's final decision was based on the evidence. He said that deannexation was a "high-profile and politically charged event in Egg Harbor," but the record gave him "great comfort that Seaview Harbor received a fair hearing." Judge Mendez also noted that McCullough had recused himself as a voting member from the Planning Board, and both Finnerty and McCullough recused themselves from the Committee. He concluded that Egg Harbor's refusal to consent was not unreasonable, arbitrary, or capricious.

Before us, plaintiffs contend Judge Mendez mistakenly concluded Egg Harbor did not act arbitrarily or unreasonably in denying consent to deannexation. More specifically, they claim that he erred in: (1) finding social harm and economic harm to Egg Harbor residents if deannexation were granted; (2) weighing the relative harms; and (3) rejecting plaintiffs' bias-related claims and rejecting their motion to supplement the record with additional evidence.

II.

A municipality's refusal to consent to deannexation is subject to review by the trial court "'under the standard principles of arbitrariness or unreasonableness.'" Avalon Manor Improvement Ass'n, Inc. v. Twp. of Middle, 370 N.J. Super. 73, 90 (App. Div. 2004) (quoting Russell v. Stafford Twp., 261 N.J. Super. 43, 48 (Law Div. 1992)). Because municipalities "have particular knowledge of local conditions," they have traditionally been afforded "'wide latitude in the exercise of their delegated discretion,'" and their decisions are presumed valid. Id. at 91 (quoting Booth v. Bd. of Adjustment of Rockaway Twp., 50 N.J. 302, 306 (1967)). The presumption is overcome only upon a showing of arbitrariness or unreasonableness, which have been interpreted to mean "'willful and unreasoning action, without consideration and in disregard of circumstances.'" D'Anastasio Corp. v. Twp. of Pilesgrove, 387 N.J. Super. 247, 251, (Law. Div. 2005) (quoting Beattystown v. Dep't of Env't Prot., 313 N.J. Super. 236, 248 (App. Div. 1998)). Where two conclusions may be reached, a decision is valid "'when exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion has been reached.'" Worthington v. Fauver, 88 N.J. 183, 204-05 (1982) (quoting Bayshore Sewerage Co. v. Dep't of Envtl. Prot., 122 N.J. Super. 184 (Ch. Div. 1973), aff'd, 131 N.J. Super. 37 (App. Div. 1974)).

A-3048-19

In 1982 the Legislature codified the current standard for deannexation petitions, which includes the arbitrary and unreasonable standard, and places the burden of persuasion on the petitioner. L. 1982, c. 182, § 2, codified as, N.J.S.A. 40A:7-12.1. "Prior to 1982 the burden was on the municipality to prove the unreasonableness of the requested deannexation." Avalon Manor Improvement Ass'n, 370 N.J. Super. at 90. The change signified a legislative intent to "'impose[] a heavier burden on the petitioners, thereby making deannexation more difficult or, perhaps, discouraging attempts to undertake the effort at all.'" Id. at 91 (quoting Russell, 261 N.J. Super. at 50). Both before and after the 1982 amendment, courts have held that the deannexation statute conveys an intention "'to give precedence to a more significant policy, that of preservation of municipal boundaries and maintenance of their integrity against challenge prompted by short-term or even frivolous considerations such as 'tax shopping' or avoidance of assessments.'" D'Anastasio Corp., 387 N.J. Super. at 260 (quoting Ryan v. Mayor & Council of Borough of Demarest, Bergen Cnty., 64 N.J. 593, 606 (1974)).

With respect to the requirement that the petitioner show that refusal to consent is detrimental to the economic and social well-being of a majority of petitioners, courts have held that relevant considerations include, but are not limited to: the geographic location of the area seeking deannexation and its

physical connection, or lack thereof, to the municipality; the petitioner's connection with both municipalities based on social interactions, emergency services and location; demographics; services provided by the municipalities; the petitioner's identity and sense of belonging; and the economic effect of deannexation in terms of taxes or any other financial consequence such as insurance premiums and construction costs or profits.  See D'Anastasio Corp., 387 N.J. Super. at 252; Avalon Manor Improvement Ass'n, 370 N.J. Super. at 78-80.  Such considerations should not be limited to the date of the petition but should extend into the future and consider the "prospect for and likelihood of change."  Avalon Manor Improvement Ass'n, 370 N.J. Super. at 102.

Notably, economic benefit to a petitioner does not necessarily equate to economic detriment if the petition is denied.  D'Anastasio Corp., 387 N.J. Super. at 254.  As the court explained in D'Anastasio Corp.,

> a resident may sign a petition for deannexation because the deannexation may result in less property tax. This is clearly an economic benefit to the residents. However, the [municipality's] refusal to consent may not be detrimental to the economic and social well-being of the residents. The residents may still be able to pay the higher property taxes, thus not evidencing detriment to the economic well-being of the residents.
>
> [Ibid.]

Further, courts have found improper petitions for deannexation where the primary basis for the petition was to obtain a lower tax rate, avoid the expense of sewage improvements, and obtain more favorable zoning to realize larger profits on the resale of developed property. Ryan, 64 N.J. at 599 (sewage improvements); D'Anastasio Corp., 387 N.J. Super. at 256 (zoning); Avalon Manor Improvement Ass'n, 370 N.J. Super. at 86 (tax shopping).

With respect to the requirement that the petitioner establish that deannexation will not cause significant injury to the well-being of the municipal residents, a court should consider the economic and social effects deannexation would have on the non-petitioning residents. In Ryan, the Court explained that

> social detriment might be found in a community's being deprived of the petitioner's participation in the religious, civic, cultural, charitable and intellectual activities of the municipality; their meaningful interaction with other members of the community and their contribution to its prestige and social standing; the part they play in general scheme of their municipality's social diversity; and, conceivably, the wholesome effect their presence has on racial integration. These are, of course, values which undergo change with the times and are accorded different weight depending in part on the composition of the community and its governing body.
>
> [Ryan, 64 N.J. at 605.]

Also relevant is the municipality's plan for development and the social and economic effect that deannexation would have on the municipality in the future. Avalon Manor Improvement Ass'n, 370 N.J. Super. at 80, 101-02.

## III.

As noted, plaintiffs first challenge Judge Mendez's finding that if deannexation were granted, Egg Harbor residents would suffer social detriment as a result of lost participation in civic groups and governmental activities, claiming that Seaview residents' participation in those activities has been decreasing and will continue to decrease. They claim no other loss to Egg Harbor's social activities will occur because Seaview residents conduct those activities in Longport, and Egg Harbor residents will continue to have access to the marina and restaurant in Seaview. Moreover, they argue that Seaview residents account for only 1/700 of the Egg Harbor population, and they are geographically separate from the mainland. They also claim the record contains no support for the finding that Egg Harbor would lose prestige and diversity if deannexation occurs.

We disagree. Judge Mendez's finding that deannexation would significantly harm Egg Harbor residents by depriving them of the benefit of Seaview residents' participation in government and civic groups as well as the

33

benefits associated with the high property value were supported by the record and warrant our deference.

For example, civic group and government records showed the level of Seaview residents' participation in such groups through the years, and plaintiffs' claim that participation has decreased and will decrease is speculative. In addition, the judge found, Seaview added to Egg Harbor's prestige and diversity, both social and economic, as it was Egg Harbor's only shore town, and it had the highest property values. See Ryan, 64 N.J. at 603 (underscoring that loss of "an affluent community whose presence adds prestige to" a municipality "is not an inconsiderable factor in determining whether social detriment would result from deannexation," and it cannot "be lightly dismissed as mere 'snob appeal' and thus unworthy for consideration").

Further, as Dr. Perniciaro explained, unlike mainland property, Seaview property was not subject to fluctuations in value and was likely to increase with time because it was a shore town. The diversity that it added to Egg Harbor's tax base helped maintain income and counter fluctuations in investments and revenue. See ibid. (stating that it was "certain that the owners of . . . exclusive and expensive homes contributed substantially more to the Borough than they cost in services").

A-3048-19

# IV.

Second, plaintiffs challenge Judge Mendez's findings regarding the economic impact to Egg Harbor residents, claiming that his decision "was based almost exclusively on the economic consequences of deannexation to [Egg Harbor]." Plaintiffs contend that the judge should have considered Egg Harbor's decreased tax revenue in terms of percentages and ratios, "not absolute dollar numbers," citing for support various statutes that discuss municipal taxes and bonding in terms of percentages. They claim that the dollar amount of lost revenue was based on the worst-case scenario and was unrealistic because forty-four percent of Egg Harbor's revenue is derived from other sources. They emphasized that in recent years Egg Harbor "has experienced an unprecedented level of growth," which it expected to continue, and claim that growth would produce tax revenue as well as revenue from construction fees and the like.

Plaintiffs also challenge the judge's finding that the police department, fire department and schools would suffer from the loss in revenue, claiming that all allegations in support of this were speculative and likely inaccurate. Similarly speculative, they claim, was the finding that Egg Harbor's bonding capability would be negatively affected by the loss of Seaview tax ratables.

Plaintiffs argue that even if Egg Harbor were to increase taxes for mainland residents to compensate for the lost tax revenue, the increase would

A-3048-19

be a modest $122.78 per year on average, which was less than the average increase of $176.61 that Egg Harbor had imposed in recent years. Because $122.78 was less than the average yearly increases, plaintiffs argue that it cannot form the basis for finding a significant injury. Further, because Egg Harbor's growth was expected to continue over the next two decades, Egg Harbor would obtain revenue from taxes and fees related to development.

We are not persuaded by any of these arguments. First, contrary to plaintiffs' claims, nothing in the applicable deannexation statute requires the court or municipality to consider tax consequences in terms of percentages or ratios. N.J.S.A. 40A:7-12.1. Rather, the statute places the burden on the petitioner to show that deannexation will not have a significant detrimental effect on Township residents, which includes consideration of actual tax consequences in the present and future. N.J.S.A. 40A:7-12.1. The statutes related to municipal taxes that plaintiffs rely upon speak in terms of percentages because they set forth law in general terms without consideration of specific facts of a specific case. Indeed, it would make no sense to restrict consideration to percentages when actual numbers are available, and those numbers paint a clear picture of the effect that deannexation would have on the residents.

In this case, the tax consequence of deannexation would either cause a loss in funding or a tax increase of $122.78 per year for the average Egg Harbor

36

A-3048-19

homeowner. As Judge Mendez found, that tax consequence is not de minimus, unlike the economic consequences in West Point Island and Bay Beach Way. As the Board explained, "[t]he Township continues to remain in a state of economic stress as a result of state mandates, the failure of the state to adequate[ly] fund programs including the gross receipts revenue, the economic recession, reductions in property values and the casino crisis in Atlantic City."

Plaintiffs' claim that revenue could be recouped by future development was entirely hypothetical and unsupported by any facts in the record. Further, as the Board concluded, even if development occurred to produce additional revenue, "increased ratables and revenue are for the benefit of the Township, schools and citizens and are not properly used to simply counterbalance the loss of revenues resulting from deannexation." These findings, relied upon by Judge Mendez, are fully supported by the record.

Moreover, such an analysis is consistent with Avalon Manor Improvement Ass'n, 370 N.J. Super. at 88, where the court rejected as improper the notion that a township could recoup taxes lost due to deannexation by selling liquor or municipal lands. In that case, Judge Lisa explained that "[w]ithout deannexation, these revenue sources, if realized, would accrue to the benefit of the taxpayers of the Township and would reduce their tax payments below the current levels, or perhaps offset increases unrelated to a deannexation." Ibid.

A-3048-19

To find that these funds should be used to remedy the economic harm that would result from deannexation would be inequitable and inconsistent with the standard set forth in N.J.S.A. 40A:7-12.1, which places the burden on the petitioner to show no significant harm to Township residents.  Ibid.

Plaintiffs' claim that a $122.78 per year tax increase is not significant in light of the average yearly tax increases Egg Harbor has typically imposed is based on an improper assumption that Egg Harbor will not have to again impose the typical tax increase.  If it does and deannexation is granted, then the average Egg Harbor homeowner would see an increase of $299.39 ($176.61 typical increase + $122.78 to compensate for taxes lost due to deannexation).  To suggest that Egg Harbor should forego imposing the typical tax increase, which presumably had been necessary to satisfy budgetary needs, in order to compensate for lost taxes due to deannexation unfairly places the negative effects of deannexation on the residents of Egg Harbor.

The alternative to not raising taxes to compensate for lost ratables would be to cut funding.  While plaintiffs challenge as speculative Egg Harbor's conclusion that police, fire, and school budgets would be cut if taxes were not raised, they provide no evidence to show that any of these budgets could function as they were without raising taxes to recoup the loss from deannexation. Logic alone defeats their argument; a budget that is not fully funded cannot fully

A-3048-19

support all items in the budget. The result is to either raise taxes or cut items out of the budget. Egg Harbor concluded that its residents could not afford either option, and that decision, like Judge Mendez's other findings that we have addressed in our opinion, is entitled to deference, as they are supported by the evidence.

V.

Third, plaintiffs contend Judge Mendez erred when he concluded that Egg Harbor residents would sustain significant injury because in reaching that determination, he failed to properly consider and weigh the significant economic and social harm that Seaview residents would suffer if they were to remain as Egg Harbor residents as compared to the minimal harm Egg Harbor residents would experience if deannexation occurred. In plaintiffs' view, the tax consequence to Egg Harbor residents is minimal compared to the tax consequence they experience (i.e., Egg Harbor residents would pay a $122 tax increase on average if deannexation were granted, while Seaview residents pay $17,950 more in taxes as Egg Harbor residents than they would as Longport residents).

They also claim that the social harm they have, and will continue to endure, is significant as they are forced to be a part of a completely separate mainland township that does not consider their needs and that is not their source

of activities or identity. On this point, plaintiffs point to Egg Harbor's willingness to completely close for repairs the Route 152 bridge, as opposed to closing one side at a time as Longport ultimately insisted be done; refusal to add a water pipe to the bridge during repairs in order to improve water supply for fighting fires; failure, until only recently, to participate in the CRS, which would have benefited Seaview residents with respect to flood insurance, based on expense to mainland residents; and failure to timely remove snow. They also claim Seaview residents have been denied the constitutional right to vote for the officials who actually provide them with emergency services, and that Judge Mendez failed to appreciate that depravation. We have carefully considered these claims and reject them.

Here, the judge considered the unique geographical location of Seaview as a non-contiguous section of Egg Harbor and properly weighed the relevant harms and his finding that Egg Harbor residents would suffer significant harm if deannexation occurred is supported by the record, as explained above. The harm included not only the potential loss of services, but the removal of a critical municipal resource—the diverse Seaview residents. That unique loss was not limited to its current and future economic impact attendant to their removal from the community, but also would have encompassed the transfer of a portion of Egg Harbor's population that historically participated in all phases of local

A-3048-19

government, continued to participate, and brought significant and substantive value to the deliberative decision-making process necessary for a healthy and robust community and government.

The most significant harm that plaintiffs claim they will experience as a result of their annexation to Egg Harbor is economic in nature:  they pay significantly higher taxes and higher flood insurance premiums as compared to Longport residents.   Plaintiffs fail to recognize, however, that such "tax shopping," or expense shopping (i.e., lower insurance rates), is an improper basis upon which to grant deannexation. See  Ryan, 64 N.J. at 606; D'Anastasio Corp., 387 N.J. Super. at 261; Avalon Manor Improvement Ass'n, 370 N.J. Super. at 86.

Moreover, as the D'Anastasio Corp. court explained, higher taxes standing alone do not establish economic detriment when residents have not established that they are unable to afford the higher taxes.  387 N.J. Super. at 254.  Here, there was no evidence in the record that Seaview residents could not afford the higher taxes so as to establish a claim of economic detriment.

As to plaintiffs' argument regarding Egg Harbor's alleged failure to provide adequate services, the majority of these claims were unsubstantiated or proven inaccurate.  For example, they presented no evidence to support their claim that Egg Harbor's provision of fire services or snow removal was

inadequate, and Egg Harbor's position regarding closure of the Route 152 bridge for repairs was within its discretion and supported by the record. As we understand the debate from the record, the disagreement centered on which option would cause the least harm—closing the bridge completely for a few months over the winter when less people resided in Seaview, or closing it one lane at a time for two-and-a-half years and disrupting the flow of traffic for residents and visitors for an extended period. Egg Harbor's decision to defer to Longport because more Longport residents would be affected by the closure was reasonable given the facts and circumstances.

Plaintiffs' emphasis on Egg Harbor's failure to construct a water pipe under the bridge to aid in firefighting is also misplaced. While the additional water pipe would alleviate the need to use water from other fire companies and fireboats for serious fires, nothing in the record established that the methods currently in use are inadequate. Plaintiffs' claims regarding Egg Harbor's inadequate provision of snow removal services were also unsupported.

Judge Mendez found that the only substantiated harm that Seaview residents suffered as a result of being part of Egg Harbor is the social harm based on residents' identity, choice of schools, and community activities, a point challenged by Egg Harbor. But, as the judge also determined, this alone did not outweigh the significant harm to Egg Harbor residents caused primarily by the

loss of tax revenue. We find no basis to conclude that Judge Mendez's considerable exercise of his discretion in that evaluation was in any way improper, as his findings were supported by the record and consistent with applicable law.

VI.

Finally, plaintiffs contend that Judge Mendez failed to adequately consider the evidence that showed McCullough, Miller, and Finnerty were biased against deannexation and that they influenced members of the Planning Board and Committee, including Paul Hodson and Laura Pfrommer, to similarly oppose it. They also claim that the judge erred by crediting Chief Davis's testimony despite evidence of his bias, and that Wiser "had a direct and personal stake" in denying the petition leading to the application of unsupported legal standards. They argue further that Judge Mendez erroneously denied their motion to supplement the record with emails and invoices that showed Miller continuously provided Wiser and Marcolongo, the Board's attorney, with information related to the petition.

As discussed, Judge Mendez concluded plaintiffs' bias claim lacked merit because plaintiffs received a full and fair opportunity to present their case to Egg Harbor, and Egg Harbor's decision to deny consent was fully supported by the record and entitled to deference. Further, the judge denied plaintiffs' motion

to supplement the record with the documents showing communication between Miller, Wiser, and Marcolongo because it found that plaintiffs had cross-examined Wiser on these documents during the Planning Board hearing. Thus, the relevant information was already in the record. Because Marcolongo served as the Board's attorney, and not a witness, plaintiffs did not cross-examine him.

Judge Mendez's evidential ruling was not an abuse of discretion. Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008). Plaintiffs' cross-examination of Wiser spanned five days and included extensive questioning on the information Miller provided Wiser and whether Miller, or anyone else on behalf of Egg Harbor, had influenced his conclusions. We are satisfied from our independent review of the extensive record, that relevant information contained in the documents was already in the record, and the documents plaintiffs wished to include would not have added any significant information material and consequential to any issue before us.

As to the bias claims related to McCullough and Finnerty, both recused themselves from the proceedings, and there is no evidence that they attempted to influence others in opposing the petition, that either had a personal stake in the matter, or that the proceedings were tainted by bias. See Piscitelli v. City of Garfield Zoning Bd. of Adjustment, 237 N.J. 333, 349-51 (2019) (explaining that public officials must not participate in decisions where they stand to receive

a financial or personal benefit or detriment and that "[t]he overall objective 'of conflict of interest laws is to ensure that public officials provide disinterested service to their communities' and to 'promote confidence in the integrity of governmental operations'" (quoting Thompson v. City of Atlantic City, 190 N.J. 359, 364 (2007))).

With respect to Miller, he had served as Township Administrator for twenty-five years. He was the "chief administrative officer of the Township," and thus, had access to relevant information, to which he testified. While it would have been better practice for him not to have expressed his opinions on deannexation, nothing in the record suggested that he was motivated by any concern other than to save taxpayers the expense of litigation that he believes was highly unlikely to succeed in light of the facts and applicable standard. Nor is there any evidence that his personal opposition to deannexation influenced voting members so as to taint the proceedings. See Szoke v. Zoning Bd. of Adjustment of Borough of Monmouth Beach, 260 N.J. Super. 341, 343-45 (App. Div. 1992) (explaining that where a government official who has recused himself improperly provides opinion testimony, the court must consider whether that opinion "poisoned the spirit of impartiality" and rendered the proceeding unfair). Finally, the evidence establishing the tax burden and loss of services

Egg Harbor residents would suffer if deannexation occurred, was significant and independent of any witness's or Board member's personal opinion.

In sum, we conclude Judge Mendez did not err in finding that Egg Harbor did not act arbitrarily or unreasonably in refusing consent to deannexation because the evidence supported a finding that Egg Harbor residents would suffer significant harm if deannexation were granted.

To the extent we have not addressed any of plaintiffs' remaining arguments, it is because we have concluded they are of insufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3048-19

46